NATURAL RESOURCES DEFENSE COUNCIL, INC., the Sierra Club, Inc., Oregon Environmental Council, Washington Environmental Council, Friends of the Earth, Eugene Future Power Committee, Inc., Plaintiffs,

v.

Donald P. HODEL, in his official capacity as Administrator of the Bonneville Power Administration, and Cecil D. Andrus, in his official capacity as Secretary of the United States Department of the Interior, Defendants.

Civ. No. 75–344.

United States District Court, D. Oregon.

July 1, 1977.

---

John Roger Beers, Palo Alto, Cal., Joe D. Bailey, Hillsboro, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Jack G. Collins, First Asst. U. S. Atty., Thomas C. Lee, Asst. U. S. Atty., D. Or., Portland, Or., for defendants.

## OPINION

SKOPIL, Chief Judge:

The plaintiffs, six environmental groups,[1] seek declaratory and injunctive relief under the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 et seq. They claim that NEPA requires the defendants[2] to prepare an environmental impact statement (EIS) before the Bonneville Power Administration (BPA) takes any action to implement the so-called "Phase 2" of the Hydro-Thermal Power Program, a long-range cooperative plan formulated by BPA, its direct-service industrial customers, and the region's public and private utilities to meet the forecasted electrical power needs of the Pacific Northwest.

The plaintiffs have moved for summary judgment. I find that there is no genuine issue as to any material fact and that NEPA requires the defendants to prepare and EIS.

## FACTS

The Bonneville Power Administration was created in 1937 by the Bonneville Project Act, 16 U.S.C. §§ 832 et seq., to market electricity generated at the Bonneville Dam on the Columbia River and to develop a transmission system for delivery of the electricity generated at this facility to its customers throughout the Pacific Northwest. Under the Act, BPA is required to give preference and priority in marketing this power to public bodies[3] and cooperatives (the "preference customers").[4] Subject to the rights of preference customers, BPA may contract to sell excess power to private agencies and persons and to dispose of such power to federal agencies for a contract period not exceeding twenty years. In the case of private utilities, any contract must provide for cancellation upon five years' notice by BPA if the power is required to meet the needs of preference customers.[5]

BPA's authority has been extended over the intervening years to the marketing of power from all federal hydroelectric projects in the Columbia River drainage basin.[6] By 1974, twenty-seven such projects were in service. These projects (built and operated by the Corps of Engineers and the Bureau of Reclamation), plus BPA's transmission system, comprise the Federal Columbia River Power System. The system supplies about one-half of the electric power consumed and provides about four-fifths of the high-voltage bulk transmission capacity in the region.

BPA sells power to approximately 153 customers in the states of Oregon, Washington, and Idaho and the portion of Montana west of the Continental Divide.[7]

1. Natural Resources Defense Council, Inc.; The Sierra Club, Inc.; Oregon Environmental Council; Washington Environmental Council; Friends of the Earth; and Eugene Future Power Committee, Inc.

2. The defendants originally named were Donald P. Hodel, BPA Administrator, and Rogers C. B. Morton, Secretary of the United States Department of the Interior. Pursuant to Fed.R. Civ.P. 25(d)(1), Cecil D. Andrus has been substituted for Mr. Morton as a defendant.

3. Defined as states, public power districts, counties, and municipalities, including agencies or subdivisions thereof. 16 U.S.C. § 832b.

4. 16 U.S.C. § 832c.

5. 16 U.S.C. § 832d.

6. The one exception is the Bureau of Reclamation's Green Springs project in Oregon.

7. Designated as the "West Group Area" of the Northwest Power Pool.

These customers include some 126 utilities (mostly preference customers plus a few private utilities), fifteen direct-service industrial customers (chiefly electroprocess companies) operating twenty-two plants, and a handful of federal agencies. In fiscal year 1974, 49 percent of BPA's power sales were to preference customers, 39 percent to direct-service industrial customers, 11 percent to private utilities, and 1 percent to federal agencies.

BPA and/or its customers participate in a number of organizations which further the common goal of planning for the region's electrical needs. The Northwest Power Pool, a voluntary organization of public and private utilities and federal power suppliers (including BPA), was established in 1942 to coordinate power operations in the northwestern United States. The Pacific Northwest Utilities Conference Committee (PNUCC) was founded several years later by West Group Area member utilities of the Northwest Power Pool and other utilities in the Pacific Northwest. Twenty-four public and private utilities are now members of the PNUCC. In addition, a 130-member Policy Committee includes representatives of most of BPA's customers who are not PNUCC members.[8] One of the important functions performed by the PNUCC is preparation of annual long-range forecasts of power loads and resources in the West Group Area of the Northwest Power Pool.[9] Two other organizations active in regional power planning—the Public Power Council and the Joint Power Planning Council— were both formed in 1966. The former is a

voluntary organization representing 110 publicly-owned utilities and cooperatives; the latter, an ad hoc group consisting of Public Power Council members, four private utilities, and BPA.

Through the individual and collective efforts of BPA, its customers, and other government agencies, the Pacific Northwest enjoyed for several decades an abundance of low-cost hydroelectric power. By the 1960s, however, it became apparent that insufficient hydroelectric power would be available to meet the anticipated tripling of demand within the following twenty years. The deficiency would have to be met by providing new power resources for the region.

Members of the Joint Power Planning Council therefore devised in 1968 a cooperative ten-year program—known as the Hydro-Thermal Power Program (HTPP)—to meet the region's power needs through 1981.[10] The program (now referred to as "Phase 1" of the HTPP contemplated a gradual transition from the use of all hydroelectric power for baseload energy to a mixed base of hydroelectric and thermal generating resources, with any new hydroelectric resources to be used to increase peaking capacity.[11] The controlling concept was the planning, construction, and operation of the region's power facilities as if they were under a single ownership. The utilities would build the required thermal (nuclear or coal-fired) plants; BPA would provide the necessary peaking capacity, high-voltage transmission grid, and reserves [12] and would pool the available

8. Neither BPA nor any other federal agency is a member of PNUCC, although BPA and other federal agencies contribute to all of PNUCC's committees and task forces.

9. See, e. g., the PNUCC "West Group Forecast of Power Loads and Resources: July 1975— June 1986" furnished by the defendants in their answer to plaintiffs' interrogatory No. 23.

10. The program is described in a document published by BPA in January, 1969, entitled "A Ten Year Hydro-Thermal Power Program for the Pacific Northwest" (Ex. A to defendants' answer).

11. "Base load" is the minimum and "peak load" the maximum amount of power required by the system over a given period of time. "Peaking capacity" is the generating capacity available to assist in meeting that portion of peak load which is above base load. See Federal Power Commission, *Glossary of Important Power and Rate Terms*, ¶ ¶ 11, 93, 121, 122 (1949) [*Glossary*].

12. "Reserve capacity" is generating capacity required to meet demands for power in excess of peak load. See *Glossary*, ¶ 148. Such demands may arise because of maintenance or emergency outages of generating facilities, unanticipated growth in base load requirements,

low-cost hydro and high-cost thermal power for sale at uniform rates. The public agencies' share of the costs for construction of thermal plants would be financed through the mechanism of "net billing".[13] The immediate goals for Phase 1 included the expansion of BPA's transmission system, the addition of new hydroelectric generators for peaking, and the construction of specified thermal plants.[14]

By early 1973, however, it became apparent that the HTPP would have to be modified to provide for the region's power needs beyond 1981. Planned thermal plants had experienced delays, demand had grown faster than had been forecasted, and the capacity for net billing was becoming exhausted. On March 12, 1973, the Acting Secretary of the Interior instructed the BPA Administrator to attempt to work out an appropriate plan for carrying forward the HTPP or some alternative procedure for an assured future power supply in the region.[15]

After extensive consultations, BPA and its customers agreed on December 14, 1973, to a cooperative plan termed "Phase 2" of the Hydro-Thermal Power Program.[16] The basic concept of the HTPP remained unchanged. Under Phase 2 the utilities were to construct eight additional baseload thermal plants [17] with a capacity of 7.56 million kilowatts to meet the region's power needs through 1986. (Additional resources were to be identified later to meet requirements through 1994.) The federal government was to construct facilities for additional peaking capacity, totaling approximately 3.7 million kilowatts, and BPA was to expand its transmission system.[18] BPA would continue to provide such services as transmission of power, reserves, load shaping, sale of power surplus to the needs of thermal project participants, and scheduling of project output on behalf of utility project participants.

In some respects, however, the Phase 2 plan differed from Phase 1. First, net billing was to be eliminated as a financing mechanism for preference customers' share of required new generating resources. The low-cost resources available under Phase 1

---

or delay in operation of scheduled new generating facilities.

**13.** Under net billing, the share of thermal plant costs of each participating BPA preference customer was to be offset against amounts owed to BPA by the customer under all its obligations to BPA.

**14.** The identity of thermal plants planned for Phase 1 has been in a state of flux. The defendants identify the plants which have been or are being constructed under Phase 1 as Centralia, Trojan, Jim Bridger No. 2 and No. 3, Washington Public Power Supply System (WPPSS) No. 1, No. 2, and No. 3, and Pebble Springs No. 1. Of these plants, Centralia and Jim Bridger No. 2 and No. 3 are coal-fired; the remainder are nuclear.

The accuracy of this list is not at all clear. Some of the plants designated by the defendants as Phase 2 projects are scheduled for completion before the plants described as Phase 1 projects. See *Affidavit of Hector J. Durocher*, pp. 3–5.

**15.** Letter of March 12, 1973, from Acting Secretary of the Interior John C. Whitaker to Administrator, BPA (Pl. Ex. I–1).

**16.** Phase 2 is described in a document dated December 19, 1973, entitled "Hydro-Thermal Program Phase 2", and in a press release is-

sued the following day (Ex. B to defendants' answer).

**17.** The document of December 19, 1973, identified four coal-fired and four nuclear plants as Phase 2 projects. The coal-fired plants were Jim Bridger No. 4, Centralia No. 3, and Boardman Coal (now known as Carty Coal) No. 1 and No. 2. The nuclear plants were Sedro Woolley (Skagit No. 1), PP&L Nuclear No. 1, WPPSS No. 4, and PGE Nuclear No. 3.

According to the defendants, the plans for Centralia No. 3, Carty Coal No. 2, PP&L Nuclear No. 1, and PGE Nuclear No. 3 have since been dropped. These projects have been replaced by WPPSS No. 5, Skagit No. 2, and Pebble Springs No. 2 (all nuclear), leaving a total of seven plants identified as Phase 2 projects. See affidavit of Hector J. Durocher, p. 5.

**18.** The latter goal has been facilitated by enactment on October 18, 1974, of the Federal Columbia River Transmission System Act, 16 U.S.C. §§ 838 *et seq.* The Act provides a mechanism for financing expansion of the transmission system from revenues and the proceeds of revenue bonds, freeing BPA from reliance upon the appropriations process. 1974 U.S.Code Cong. & Admin.News p. 5819.

through 1983 would be allocated among preference and industrial customers. Preference customers would have to meet increased baseload energy requirements beyond 1983 by participating directly or indirectly in construction of new thermal plants generating higher-cost power. Those not wishing to participate directly could have BPA act as their agent in purchasing power for them. The second major change contemplated under Phase 2 was an increasingly important role for BPA's direct-service industrial customers. In exchange for securing new 20-year contracts, these customers would agree to purchase up to 1,000 megawatts to provide extra reserves for the area (in effect guaranteeing the construction of the equivalent of one new nuclear plant). If the reserves were needed for use by utilities, the power could be withdrawn from the industrial customers under contract provisions giving them a lower grade of power than under Phase 1. To implement these changes, four new types of contracts were to be developed: (1) new 20-year Power Sales Contracts with preference customers, (2) Trust-Agency Agreements with participating preference customers, (3) agreements to provide services to thermal project participants not parties to the Trust-Agency Agreements, and (4) new 20-year Power Sales Contracts with direct-service industrial customers.

After the agreement on Phase 2 was announced in December, 1973, environmental groups and state government officials urged BPA to prepare an EIS on the Hydro-Thermal Power Program.[19] As a result, BPA prepared and submitted to the Council on Environmental Quality (CEQ) on April 1, 1975, a draft EIS entitled "BPA Participation in Regional Interutility Cooperation".[20] The Chairman of the CEQ found the draft EIS, however, to be "a perplexing document . . . inadequate to comply with the requirements of NEPA and the CEQ Guidelines . . . ."[21] The Chairman wrote:

"In our view, the amalgam of BPA, Interior Department and congressional actions surrounding the development of the Hydro-Thermal Program leaves no doubt that it is a 'major federal action' within the meaning of Section 102(2)(C) of NEPA. 'Federal action' exists when an agency makes a decision which leads to actions by other parties which will affect the quality of the environment. (*SIPI v. AEC,* 5 ERC 1418, 1423 (D.C.Cir.1973)). In addition, as pointed out in its EIS, BPA will be an integral factor in implementation of the program through its transmission, marketing, coordination, reserve power, and peak-load functions. The fact that private utilities and other Federal and state agencies will play an important role in the program does not dismiss BPA from its impact statement responsibilities.

.    .    .    .    .

". . . Of particular concern is that the draft contains relatively little detail on the regional program *or* on BPA's participation; that it presents only the most general, unquantified discussion of environmental impacts; and that in some respects it appears to be written as a justification for the BPA role.

"In our view, an appropriate course of action would be to redraft this impact statement to focus specifically on the Hydro-Thermal Program. The most critical components of such an EIS would be a full description of the Program as presently planned, the best possible assessment of the *cumulative* environmental impacts, and a discussion of reasonable alternatives. . . ."[22]

BPA has since undertaken the preparation of a revised EIS focused more specifically on the HTPP, to be called "The Role of BPA in Pacific Northwest Power Supply

19. See, *e. g.,* Pl. Ex. I–6, 7, 8, 9, 10, 11, 14, 15, 16; VI–1.

20. Pl. Ex. V–5.

21. Letter of May 7, 1975, from Russell W. Peterson to Acting Secretary of the Interior Kent Frizzell (Pl. Ex. I–19), at 3.

22. *Id.* at 5–6 (emphasis in original).

System, Including Its Participation in the Hydro-Thermal Power Program" (the "Role EIS"). The defendants have informed the court that they intend to file a cross-motion for summary judgment upon completion of the Role EIS. However, they have not yet done so.

This action was commenced on April 17, 1975. After BPA announced its intention to prepare the Role EIS, the plaintiffs sought a voluntary agreement by the defendants to defer any action to implement Phase 2 until completion of the EIS. The defendants refused to agree. Moreover, they have never conceded that an EIS on Phase 2 is required by NEPA. Consequently, the plaintiffs filed their motion for summary judgment.

## THE PLAINTIFFS' CLAIMS

The plaintiffs contend that Phase 2 constitutes a proposal for major federal action significantly affecting the quality of the human environment, for which NEPA requires preparation of an EIS.[23] They identify the agreement of December 14, 1973, as the requisite "proposal". They say that BPA's important role in Phase 2 makes that program "major federal action". And they list numerous ways in which the HTPP affects the quality of the human environment.[24] They claim that summary judgment is appropriate because there is no genuine issue as to any material fact.[25] In support of their motion, plaintiffs rely upon the complaint and answer, the defendants' answers and supplemental answers to the plaintiffs' interrogatories, the deposition of Donald P. Hodel, and the affidavit and supplemental affidavit (with exhibits) of John Roger Beers.

The defendants' answer denies these allegations and raises six affirmative defenses: failure to state a claim, lack of standing, lack of subject-matter jurisdiction, prematurity, failure to exhaust administrative remedies, and primary jurisdiction in other state and federal agencies. In response to the motion for summary judgment, the defendants contend that (1) the existence of material fact issues precludes summary judgment and (2) even if summary judgment were appropriate, the plaintiffs are not entitled to relief under NEPA. The defendants have submitted affidavits of

23. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), provides that all agencies of the federal government shall

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
  "(i) the environmental impact of the proposed action,
  "(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
  "(iii) alternatives to the proposed action,
  "(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
  "(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

24. Paragraph 4 of the complaint summarizes some of the effects upon the environment:

"The significant adverse environmental effects of Phase 2 include, among others, contamination of the air in local areas of Oregon, Washington, Montana and Wyoming due to the emission of hazardous particulates and gases from coal-fired power plants; serious loss of aquatic life in the Columbia, Chehalis and Skagit Rivers due to thermal and chemical pollution from nuclear power plants; increased fish mortality, decreased recreational safety and disruption of commerce on the Columbia River due to increased use of hydro generators for peaking power; the risk of a catastrophic accident and routine release of hazardous radioactive materials at nuclear power plants and their supporting facilities; disruption of wildlife habitat and removal of thousands of acres of land from agricultural and recreational uses due to the construction of transmission lines; and destruction of thousands of acres of other agricultural lands due to the surface mining of coal and uranium."

These and other effects are described in greater detail in paragraphs 28–33 of the complaint and paragraphs 38–45 of the affidavit of John Roger Beers.

25. In the event summary judgment is denied, plaintiffs seek a preliminary injunction pending trial on the merits.

eleven witnesses [26] in support of their position.

### IS SUMMARY JUDGMENT APPROPRIATE?

The plaintiffs bolster their motion for summary judgment by pointing to my decision of August 26, 1975, in the case of *Port of Astoria v. Hodel*, 8 ERC 1156 (D.Or. 1975), appeals docketed, Nos. 75–3465 (Nov. 11, 1975), 75–3621 (Dec. 2, 1975), 75–3699 (Dec. 26, 1975), and 76–1049 (Jan. 12, 1976), 9th Cir. The plaintiffs in *Port of Astoria* claimed that NEPA required BPA to prepare an EIS before executing a Phase 2 contract with one of its direct-service industrial customers, the Alumax Pacific Corporation (Alumax). I held that the BPA power contract enabled the construction of the Alumax plant, with its attendant environmental effects, and thereby rendered BPA's execution of the contract major federal action requiring preparation of an EIS.

More important to the present case, I stated in the *Port of Astoria* opinion that the execution of the contract also constituted major federal action because it was a significant step in implementing Phase 2. *Id.* at 1160. The language of that opinion lends strong support to the plaintiffs' contentions:

"The Umatilla contract implements a federal policy which BPA calles [*sic*] 'Phase 2 of the Hydro-Thermal Program' (Phase 2).

"From 1968 BPA and publicly and privately owned utilities have co-operated under a generalized policy regarding the power supply in the Pacific Northwest. The original joint effort, called Phase 1, intended to cover the Northwest's power needs through the 1980s. However, unanticipated shortages and construction delays required another long-range plan. This plan, Phase 2, expects to meet the Pacific Northwest's power needs beyond 1981. Industrial Power contracts of the type signed by Alumax are an integral feature of Phase 2, especially the reserves and financing provided by the third quartile provision.

"BPA objects that Phase 2 is not major federal action. BPA contends Phase 2 is merely the continuation of Phase 1—a viable pre-NEPA policy. BPA argues that Congress has granted BPA unimpeded marketing authority separate from NEPA; that Phase 2 is a mere non-obligatory policy with no action required; that BPA plays only a minor role in Phase 2 with no power to demand cooperation; and finally, that the Umatilla contract plays an undeterminable, minimal role in Phase 2 and does not affect the amount of power available in the future.

"BPA's objections lack substance. The industrial contracts—the key feature of Phase 2—are intended to increase BPA's power reserves by 1981 in an amount equal to that produced by a nuclear generating plant. By manipulating the grades of power, BPA has in effect constructed a future nuclear plant. Admittedly, cancelling the Umatilla contract would not provide BPA with additional power to sell, but it would increase BPA's annual reserves in an amount equal to the power used by Eugene, Oregon. Phase 2 is a strong policy in its own right. It enables BPA to avoid costly breaches of contract as the strain on its wholesale reserves becomes more critical. BPA previously tried to withdraw from the Warrenton contract because of its concern with future reserve shortages.

"BPA markets fifty percent of the Pacific Northwest's power. It is physically and practically dominant in Phase 2. By requiring industrial customers to sign contracts with the third quartile provision, BPA ensures the financing of the necessary thermal generating plants for public and private utilities. If Phase 2 is merely a continuation of Phase 1, then the third quartile provision is sufficiently

---

**26.** George S. Bingham, William E. Bruner, Russell N. Dorran, Hector J. Durocher, Lyman J. Harris, Myron B. Katz, David H. Knight, R. B. Lisbakken, John G. McLeod, J. J. Stein, and Ronald H. Wilkerson.

different to require an EIS. *Cf. Lathan v. Brinegar,* 506 F.2d 677 (9th Cir. 1974); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973)." *Id.*

Despite the *Port of Astoria* decision and the evidentiary materials submitted by the plaintiffs in support of their motion, the defendants insist that genuine issues of material fact preclude granting summary judgment. Their memorandum in opposition to the motion lists seven areas of supposed dispute.[27]

I find that no genuine issue exists as to any material fact. Some of the defendants' so-called issues raise the same contentions laid to rest in the *Port of Astoria* case.[28] Others are simply not material to the ultimate question of whether an EIS is required.[29]

The defendants' most substantial argument is that the facts have changed since Phase 2 was conceived in 1973 and that BPA no longer plays the role contemplated for it at that time. Affidavits establish that the financing and construction of Phase 2 thermal plants is proceeding without the direct participation of BPA.[30] The four new types of contracts contemplated under Phase 2[31] have never been finalized or executed. According to BPA's Assistant Administrator for Power Management, the need for the Trust-Agency Agreements

with preference customers has been eliminated and no new Power Sales Contracts with direct-service industrial customers will be executed when the present ones expire in the mid-1980s.[32] Finally, possible modifications of various elements of Phase 2 are under consideration.[33]

Undoubtedly, Phase 2 is not static. The substance of the HTPP—and of Phase 2—has remained constant, however, despite the inevitable modifications that have occurred.[34] The ultimate goal remains the planning, construction, and operation of the region's power facilities as if they were under a single ownership. Baseload power will depend increasingly upon thermal generating resources, while peaking power will be provided by hydroelectric resources. The utilities will build the required thermal plants. BPA will provide the necessary peaking capacity and high-voltage transmission grid, along with reserves, load shaping, sale of surplus power, and scheduling of project output.

The changes in Phase 2 alleged by the defendants are in some cases merely cosmetic. For example, although BPA has not yet executed the contemplated agreements to provide services to thermal project participants, it has acceded to the demands for assurance of its preference customers by issuing letters of intent to them.[35] The

27. See Defendants' Statement and Affidavits in Opposition to Plaintiffs' Motion for Summary Judgment and Preliminary Injunction, at pp. 14–16.

28. The defendants claim, for example, that Phase 2 is not an "agreement" but merely a cooperative plan of development which has never been binding on any party. They also claim that the ability to produce environmental effects rests with the sponsors of thermal projects, not in Phase 2. *Id.* at 14–15.

29. Thus, it does not matter who prepares load forecasts, what precisely is the subject of the Role EIS now being written, or whether BPA is committed to completing that EIS. *Id.* at 15–16.

30. See the affidavits of Russell N. Dorran, Lyman J. Harris, David H. Knight, and J. J. Stein.

31. See page 8, *supra.*

32. Affidavit of Hector J. Durocher, pp. 8–11.

33. The Pacific Northwest Regional Commission, a federal-state partnership including the states of Oregon, Washington, and Idaho, has commissioned the Northwest Energy Policy Project to conduct a two-year study identifying and evaluating energy policy choices in the region. See affidavits of William E. Bruner and Myron B. Katz. BPA itself has recently prepared the draft of a "Study Paper for Regional Power Planning" (Pl. Ex. I–27) which discusses possible methods for financing future thermal plants and assuring long-term power supplies for BPA's direct-service industrial customers. See also Pl. Ex. I–28.

34. Indeed, it might be observed that the modifications that have occurred are largely a result of NEPA litigation.

35. See Exhibits 2 and 3 to the affidavit of Hector J. Durocher.

respects in which Phase 2 has changed significantly do not affect the question of whether NEPA requires preparation of an EIS.

Finally, although the defendants have raised in their answer the affirmative defenses of failure to state a claim, lack of standing, lack of subject-matter jurisdiction, prematurity, failure to exhaust administrative remedies, and primary jurisdiction in other agencies, they have presented neither argument nor affidavits in support of these defenses. I can perceive no genuine issue of material fact which they present. I therefore turn to the merits of plaintiffs' NEPA claim.

## DOES NEPA REQUIRE AN EIS?

■ Plaintiffs' members live, work, and enjoy recreational pursuits in areas which will be affected by activities contemplated under Phase 2.[36] The plaintiffs unquestionably have standing to raise the issue of whether NEPA requires preparation of an EIS on Phase 2 of the HTPP. See *Sierra Club v. Morton,* 405 U.S. 727, 731–735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Cady v. Morton,* 527 F.2d 786, 791 (9th Cir. 1975).

■ The defendants' position is that Phase 2 of the HTPP constitutes neither a "proposal" nor "major federal action" within the meaning of section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).[37] (They have presented neither evidence nor argument that activities contemplated under Phase 2 will not significantly affect the quality of the human environment.) Their argument is succinctly stated in their answer to plaintiffs' interrogatory No. 32:

"... HTPP overall is not a 'major Federal action significantly affecting the quality of the human environment,' as those terms are used in Section 102(2)(c) [*sic*] of the National Environmental Policy Act. Simply stated, it is

clear that the HTPP is not related only to federal action but instead to action within the entire Pacific Northwest. It is not a program in the sense that it requires either action or results, rather it is a concept of 'one utility' in the Pacific Northwest to which all those who participate in the electric energy generation, transmission or utilization can relate when plans are being made for further generation, transmission or utilization. The plans and decisions under this are not made in concert, nor do any of them require consensus. The decisions are those of the generating utility, of the transmission line constructor or the consuming purchaser. There is no necessary interrelationship between the plans to do any of the activities which might be related to HTPP and any other activity which either interconnects or relates to production or consumption of electric energy."

I find this argument totally unacceptable under both the facts and the law.

Assuming for the moment that the requisite "proposal" exists, it is quite clear that Phase 2 of the HTPP constitutes major federal action.

Phase 2 is "major" in both the environmental and economic sense even when only the proposed unilateral actions of BPA are considered. The construction of transmission facilities will require that vast acreages of land be converted from their present agricultural, recreational, and other uses, with accompanying disruption of fish and wildlife habitats. The increasing use of hydroelectric generators to meet peak load will cause large, rapid fluctuations of water levels affecting recreational activities, commerce, and aquatic life. The federal investment in the HTPP is in the billions of dollars.[38]

---

**36.** See plaintiffs' answer to defendants' interrogatories No. 4 and No. 5.

**37.** See note 23, *supra,* for the text of the statute.

**38.** BPA estimated in 1971 that investment in electric power facilities under the HTPP would eventually total $18 billion. Of that sum, approximately one-quarter would come from the federal government ($2.1 billion for hydro facilities and $2.3 billion for transmission facilities). Pl. Ex. II–2, at 20. The defendants are unable

The thermal plants to be constructed under Phase 2 by nonfederal entities are also clearly "major" in terms of their environmental effects. The defendants contend, however, that BPA has nothing to do with the planning, financing, and construction of these plants and that they are not "federal" actions within the meaning of NEPA. This contention ignores a plethora of cases holding that an essentially private project is "federalized" for purposes of NEPA when federal action has enabled the project to come to fruition. See, e. g., *Sierra Club v. Hodel,* 544 F.2d 1036, 1044 (9th Cir. 1976) (BPA contracted to supply power and construct transmission line to magnesium plant); *City of Davis v. Coleman,* 521 F.2d 661, 674–677 (9th Cir. 1975) (construction of freeway interchange would provide access to the area for future industrial development); *National Forest Preservation Group v. Butz,* 485 F.2d 408, 411–412 (9th Cir. 1973) (massive land exchange would allow former national forest lands to be used for Big Sky recreational development); *Port of Astoria v. Hodel,* 8 ERC 1156, 1159–1160 (D.Or.1975) (BPA contracted to supply power to aluminum reduction plant under Phase 2 and to construct transmission line to plant). The defendants have tried mightily to disclaim any responsibility for the Phase 2 thermal plants, but I find their disclaimers unconvincing. BPA plays a pivotal role in the HTPP and in Phase 2. Without federal peaking power and transmission systems and the services performed by BPA, construction of these plants would be inconceivable in the absence of very substantial change.

Having concluded that the actions contemplated under Phase 2 are both "major" and "federal", I must decide whether the requisite "proposal" is present. I find that Phase 2 is such a proposal.

Both parties rely upon a recent Supreme Court case, *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In that case the Department of the Interior had prepared EISs both on the national coal leasing program as a whole and on individual leases to be executed locally. The plaintiffs, however, contended that NEPA required the preparation of still another EIS covering the Northern Great Plains region. The Supreme Court rejected this contention, finding that no "proposal" for regional action existed. The Court held that NEPA is triggered only when a proposal is made: neither the mere contemplation of action nor the existence of intimately-related projects is sufficient.

The facts in *Kleppe* were strikingly different from those in the case at hand. In *Kleppe* the record was bereft of evidence that any regional plan existed:

"But there is no evidence in the record of an action or a proposal for an action of regional scope. The District Court, in fact, expressly found that there was no existing or proposed plan or program on the part of the Federal Government for the regional development of the area described in respondents' complaint. It found also that the three studies initiated by the Department in areas either included within or inclusive of respondents' region—that is, the Montana-Wyoming Aqueducts Study, the North Central Power Study, and the NGPRP—were not parts of any plan or program to develop or encourage development of the Northern Great Plains. That court found no evidence that the individual coal development projects undertaken or proposed by private industry and public utilities in that part of the country are integrated into a plan or otherwise interrelated. These findings were not disturbed by the Court of Appeals, and they remain fully supported by the record in this Court.

"Quite apart from the fact that the statutory language requires an impact statement only in the event of a proposed action, respondents' desire for a regional environmental impact statement cannot be met for practical reasons. In the ab-

to identify with any precision the federal investment allocable to Phase 2; however, transmission facilities alone will cost many millions of dollars. See defendants' answer to plaintiffs' interrogatory No. 15.

sence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement. Section 102(2)(C) requires that an impact statement contain, in essence, a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved in it, and the alternatives to it. Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in [the region identified by respondents], and thus impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity. A regional plan would define fairly precisely the scope and limits of the proposed development of the region. Where no such plan exists, any attempt to produce an impact statement would be little more than a study along the lines of the NGPRP, containing estimates of potential development and attendant environmental consequences. There would be no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA.[14]

"14. In contrast, with both an individual coal-related action and the new national coal-leasing program, an agency deals with specific action of known dimensions. With appropriate allowances for the inexactness of all predictive ventures, the agency can analyze the environmental consequences and describe alternatives as envisioned by § 102(2)(C). Of course, since the kind of impact statement required depends upon the kind of ' "federal action" being taken,' *Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II )*, 422 U.S. 289, 322, 95 S.Ct. 2336, 2357, 45 L.Ed.2d 191 (1975), the statement on a proposed mining plan or a lease application may bear little resemblance to the statement on the national coal-leasing program. Nevertheless, in each case the bounds of the analysis are defined, which is not the case with coal development in general in [the region identified by respondents]." *Id.* at 400–403, 96 S.Ct. at 2726–2727. (footnotes other than 14 omitted).

In the present case, on the other hand, the record abounds with evidence that the Pacific Northwest is regarded as a distinct region for purposes of electrical power planning. Both Phase 1 and Phase 2 of the HTPP are specific plans for regional development, hammered out after long negotiations and embodied in published documents. Individual projects undertaken by the federal government, by public and private utilities, and by industry are interrelated according to an integrated plan. The HTPP "define[s] fairly precisely the scope and limits of the proposed development of the region", given "the inexactness of all predictive ventures". *Id.* at 402, 96 S.Ct. at 2727. Indeed, the HTPP can be compared to the national program in *Kleppe,* of which the Court said:

"[T]he federal petitioners agreed at oral argument that § 102(2)(C) required the Coal Programmatic EIS that was prepared in tandem with the new national coal-leasing program and included as part of the final report on the proposal for adoption of that program. Tr. of Oral Arg. 9. Their admission is well made, for the new leasing program is a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Id.* at 400, 96 S.Ct. at 2726.

The Ninth Circuit cited *Kleppe* in a recent case involving BPA, *Sierra Club v. Hodel,* 544 F.2d 1036 (9th Cir. 1976). The plaintiffs in that case contended that an EIS must be prepared before BPA entered into a contract to supply electrical power to an aluminum reduction plant. The plaintiffs' chief argument was that the plant's great power requirements would be a drain on the hydroelectric power available in the region. They alleged that an EIS must be prepared to show the interrelationship between the power allotment to the aluminum plant and power allotments to other users. In citing *Kleppe,* the court said:

"In the case now before us, although there is a general 'Pacific Northwest' region to which Bonneville supplies a great amount of hydroelectric power, *there is no record showing of a master plan for development of the region.* The Bonneville Project simply provides authority to the Administrator to market power not necessary to operate the project and the navigation facilities employed in connec-

tion therewith. 16 U.S.C. § 832. Here, as in *Kleppe v. Sierra Club, supra, there is reference to other contracts with industry but not on a regionally organized basis.* Although power is to be sold for the benefit of the public and particularly of domestic and rural consumers with preference and priority to public bodies and cooperatives, 16 U.S.C. § 832c, there is no regional plan of development either by geographical area, by customer, or by percentage of total power generation capacity. We affirm the judgment of the district court in its decision that no environmental impact statement was required in order to show the energy effect of this contract upon all other contracts or energy users of the Bonneville project." *Id.* at 1040–1041 (emphasis added).

*Sierra Club v. Hodel* cannot help the defendants. The question raised in *Sierra Club v. Hodel* was different from that raised in the case at hand. In any event, the record in this case establishes beyond a doubt that a master plan for regional development does exist.

It is not enough that the defendants or other federal officials have faithfully prepared an EIS for each individual transmission facility and hydroelectric project added to the Federal Columbia River Power System since NEPA was enacted, nor that they will continue to do so. The Guidelines for the Preparation of Environmental Impact Statements promulgated by the Council on Environmental Quality (CEQ Guidelines) point out the importance of "programmatic" EISs which evaluate the cumulative impacts of a number of separate, but related, actions:

"(a) The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to

be prepared. . . . In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action. In all such cases, an environmental statement should be prepared if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal action." CEQ Guidelines, 40 C.F.R. § 1500.6(a) (1976).

"(d)(1) Agencies should give careful attention to identifying and defining the purpose and scope of the action which would most appropriately serve as the subject of the statement. In many cases, broad program statements will be required in order to assess the environmental effects of a number of individual actions on a given geographical area (e. g., coal leases), or environmental impacts that are generic or common to a series of agency actions (e. g., maintenance or waste handling practices), or the overall impact of a large-scale program or chain of contemplated projects (e. g., major lengths of highway as opposed to small segments). Subsequent statements on major individual actions will be necessary where such actions have significant environmental impacts not adequately evaluated in the program statement." *Id.,* § 1500.6(d)(1).

The Supreme Court acknowledged in *Kleppe* that a comprehensive EIS is sometimes required:

"We begin by stating our general agreement with respondents' basic premise that § 102(2)(C) may require a comprehensive impact statement in cer-

tain situations where several proposed actions are pending at the same time. . . A comprehensive impact statement may be necessary in some cases for an agency to meet [its duty to assure consideration of the environmental impact of its actions in decisionmaking]. Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club, supra,* 427 U.S. at 409–410, 96 S.Ct. at 2730 (footnotes omitted).

Cf. *Cady v. Morton,* 527 F.2d 786, 794–795 (9th Cir. 1975); *Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S. App.D.C. 395, 481 F.2d 1079 (1973). Only a programmatic EIS focusing on Phase 2 as a whole will satisfy the requirements of NEPA.[39]

No one questions that the Pacific Northwest is in the throes of an energy crisis. Additional sources of energy must be found as soon as possible. BPA and the area's public and private utilities are to be commended for their diligence and foresight in seeking a solution to this problem. The delays inherent in complying with NEPA are regrettable, but Congress has determined that certain procedural requirements must be satisfied to achieve goals believed to be important. The judicial function is to see that valid laws enacted by the legislative branch are carried out.

In view of the history of this litigation, one more observation should be made in order to avoid any future misunderstanding about the import of this opinion. I do not regard the label "Phase 2" as some sort of talisman crucial to the plaintiffs' case. Phase 2 is not now and never has been a rigid, fixed plan. Thermal plant locations are likely to change, new methods for financing their construction may be devised, and a way may yet be found to provide BPA's direct-service industrial customers with low-cost power after their present contracts expire. So long as these modifications do not change the basic concept of the HTPP, however, a programmatic EIS must be completed before BPA undertakes any further action to implement Phase 2.

### RELIEF

The plaintiffs are entitled to summary judgment in their favor and to entry of a judgment declaring that the defendants are required by NEPA to prepare an EIS on Phase 2 of the Hydro-Thermal Power Program.

The question of what form of injunctive relief is appropriate is more problematical. I do not wish to hinder the vigorous pursuit of ways to satisfy the region's electrical power needs. I also have no intention of interjecting this court into the daily operations of an entity such as the Bonneville Power Administration. Finally, isolation of Phase 2 from Phase 1 for purposes of injunctive relief presents problems difficult to resolve.

Before entry of judgment, therefore, I shall direct the Clerk to set a conference with counsel regarding the need for and the proper form of injunctive relief. The parties are urged to make every possible agreement to reach a voluntary accord. If they cannot agree on these questions, counsel should submit to the court prior to the conference any written materials, including

---

**39.** Plaintiffs' counsel stated during oral argument (Tr. 5–6) that a programmatic EIS on the HTPP was probably required even before Phase 2 was announced. The Ninth Circuit has frequently noted that NEPA applies to federal projects that were ongoing at the time NEPA was enacted, so long as significant federal action remained to be taken. See, *e.g., Cady v. Morton, supra,* 527 F.2d at 794; *Robinswood Community Club v. Volpe,* 506 F.2d 1366, 1369–70 (9th Cir. 1974); *Lathan v. Brinegar,* 506 F.2d 677, 687–689 (9 Cir. 1974) (en banc); *Life of the Land v. Brinegar,* 485 F.2d 460, 466 n.7 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Plaintiffs do not seek to halt Phase 1 projects, however, but only to prevent the defendants from taking any actions to implement Phase 2 before completion of an EIS.

proposed forms of judgment, which they believe may be helpful. After judgment has been entered, this court shall retain jurisdiction of this proceeding until a final EIS complying with NEPA has been filed.