NATURAL RESOURCES DEFENSE COUNCIL, INC.; The Sierra Club, Inc.; Oregon Environmental Council; Washington Environmental Council; Friends of the Earth; Eugene Future Power Committee, Inc., Plaintiffs,

v.

Sterling MUNRO, in his official capacity as Administrator of the Bonneville Power Administration; and James R. Schlesinger, in his official capacity as Secretary of the United States Department of Energy, Defendants.

Civ. No. 75–344–RE.

United States District Court,
D. Oregon.

May 15, 1981.

Ralph Cavanagh, Natural Resources Defense Council, Inc., San Francisco, Cal., Joe D. Bailey, Portland, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Thomas C. Lee, Asst. U. S. Atty., Portland, Or., for defendants.

Allan Hart, Jonathan Ater, Lindsay, Hart, Neil & Weigler, Portland, Or., for amici curiae.

REDDEN, District Judge:

Defendants move to vacate the judgment and dismiss this case on the grounds that (1) the case is moot, (2) prospective application of the judgment would be inequitable, and (3) the judgment has been satisfied. Plaintiffs oppose the motion.

*Nature of the case*

Six environmental groups [1] brought this action for declaratory and injunctive relief under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–47. They claimed that the Bonneville Power Administration (BPA) should not be allowed to take any action with respect to "Phase 2" of the "Hydro-Thermal Power Program" (HTPP) until an environmental impact statement (EIS) was prepared. This

1. Natural Resources Defense Council, Inc.; The Sierra Club, Inc.; Oregon Environmental Council; Washington Environmental Council; Friends of the Earth; Eugene Future Power Committee, Inc.

court held that an EIS was required and issued an injunction prohibiting defendant administrator of BPA and defendant Secretary of the Interior from taking any action to implement Phase 2 or any program equivalent to Phase 2 before an appropriate EIS was filed.[2] The court retained jurisdiction of the case pending the filing of an EIS. The Court of Appeals affirmed the ruling.[3]

On December 5, 1980, Congress enacted the Pacific Northwest Electric Power Planning and Conservation Act (Power and Conservation Act), Pub.L. 96–501, 94 Stat. 2697. Defendants contend that passage of the Power and Conservation Act constitutes a Congressional resolution of the issues raised in this action, and that the injunction entered by this court is no longer necessary or appropriate.[4]

*BPA's "Phase 2" Program* [5]

In 1968, a "Joint Power Planning Council," consisting of representatives of a public utilities' organization (Public Power Council), four private utilities and BPA, devised a ten-year hydro-thermal power program to meet the Northwest's power needs through 1981. Under the program, the utilities were to build thermal (nuclear and coal-fired) power plants. The addition of thermal energy would provide a mixed base of hydroelectric and thermal power for baseload energy purposes.[6] Any new hydroelectric resources were to be used to increase peaking capacity.[7] BPA's role in the HTPP was to provide the necessary peaking capacity, a high voltage transmission grid and reserve electric power in excess of peakload needs. BPA was also to pool the available low-cost hydroelectric and high-cost thermal power for sale to its customers at uniform rates. Public agencies' share of the costs of the thermal plants' construction would be financed through net-billing arrangements; i.e., the share of the plant costs would be offset against amounts owed to BPA by the preference customers.

In 1973, it became apparent that the HTPP would have to be modified to meet the Northwest's energy needs after 1981. The implementation of "Phase I" of the HTPP (up to 1981), was not sufficient because of delays in constructing thermal power plants, because the demand for energy was increasing at a faster rate than forecasted, and because the capacity for net-billing was being exhausted. The Department of Interior therefore instructed BPA to attempt to design an appropriate plan to extend the HTPP or to provide an alternate procedure to provide energy for the Northwest beyond 1981. Following consultations with its customers, BPA drafted a program entitled "Phase 2" of the HTPP. The utilities were to build eight additional thermal plants to provide baseload energy sufficient to meet the Northwest's energy needs until 1986. The federal government was to construct facilities for additional peaking capacity, and BPA was once again to expand its transmission system. BPA was to continue to provide transmission of power, reserves, load shaping, sale of power surplus to the needs of the participants in the thermal plants and the scheduling of project output on behalf of the participating utilities.

Phase 2 eliminated the use of net-billing as a means of financing the preference customers' share of the construction costs of

---

2. 435 F.Supp. 590 (D.Or.1977).

3. 626 F.2d 134 (9th Cir. 1980).

4. Defendants' position is supported by a brief filed by amici curiae, Clatskanie People's Utility District, Tillamook People's Utility District, Pacific Power and Light Company and Reynolds Metals Company. These entities are typical of the three categories of BPA customers: public bodies, investor owned utilities and direct service industries.

5. This background contains a broad overview only. A more detailed history can be found in the court's opinion of July 1, 1977.

6. "Baseload energy" is the minimum amount of energy required over a specific period of time. "Peakload energy" is the maximum amount of energy required.

7. "Peaking capacity" is the generating capacity available to meet the portion of peakload which is above baseload.

additional thermal plants. Any low-cost hydroelectric power available under Phase I was to be allocated to preference and industrial customers until 1983. After that, preference customers would have to participate directly or indirectly in the construction of thermal plants generating the high-cost power.

A major change from Phase I to Phase 2 was to be the increasingly important role of direct-service industrial customers (DSIs). The DSIs were to be granted new 20-year contracts with BPA. In return, they would agree to purchase up to 1,000 megawatts of reserve power which would be made available to the utilities if needed. To implement these arrangements, four types of contracts were to be used: (1) twenty-year power contracts with preference customers; (2) trust-agency agreements with participating preference customers; (3) agreements to provide services to thermal plant participants not parties to the trust-agency agreements; and (4) twenty-year power sale contracts with the DSIs.

Phase 2 was made public in December 1973. In April 1975, BPA submitted a draft EIS entitled "BPA Participation in Regional Interutility Cooperation" to the Council on Environmental Quality (CEQ). The Chairman of the CEQ rejected the EIS as inadequate. He criticized the lack of detail with respect to the regional program and BPA's participation in it. He provided some guidelines for a new EIS by stating:

> The most critical components of such an EIS would be a full description of the Program as presently planned, the best possible assessment of the cumulative environmental impacts, and a discussion of reasonable alternatives.... [8]

BPA subsequently announced that it was preparing an EIS entitled "The Role of BPA in Pacific Northwest Power Supply System, Including Its Participation in the Hydro-Thermal Power Program."

On April 17, 1975, plaintiff environmental groups filed this action contending that Phase 2 constituted a major federal action proposal significantly affecting the quality of the human environment, and that an EIS was therefore required under NEPA. They contended that Phase 2 would adversely affect the environment in numerous ways including: Contamination of the air due to the emission of hazardous particulates and gases from coal-fired thermal plants; serious loss of aquatic life in certain Northwest rivers because of the thermal and chemical pollution emitted from nuclear power plants; increased fish mortality; decreased recreational safety and disruption of commerce on the Columbia River due to the increased use of hydro generators; the risk of a catastrophic nuclear accident, as well as the routine emission of hazardous radioactive materials from nuclear power plants; the disruption of wildlife habitat; the loss of thousands of acres of land used for agricultural and recreational purposes, due to the construction of transmission lines; and the loss of thousands of acres of other agricultural land due to the surface mining of coal and uranium.[9]

Plaintiffs moved for summary judgment on its claim that Phase 2 required the preparation and filing of a "programmatic" EIS. The court held that a programmatic EIS was required.

*Scope of Injunction*

Following the favorable ruling on plaintiffs' behalf, the court issued an injunction requiring defendants to prepare an appropriate EIS before implementing Phase 2.[10] The injunction prohibited BPA from doing the following:

(1) Providing for new long-term contracts, or amendments of existing long-term contracts with DSIs, which increase the term, amount or quality of service to such DSIs or which constitute commitments to new DSI customers;

**8.** Letter of May 7, 1975, from Russell W. Peterson to the Acting Secretary of the Interior, Kent Frizell.

**9.** See Paragraphs 4 and 28–33 of plaintiffs' complaint.

**10.** See judgment entered on January 9, 1978.

(2) entering into contracts, or amending contracts to enable or directly enhance the prospect of financing, constructing or operating new thermal plants (excluding those provided in Phase I), including but not limited to commitments by BPA to purchase the energy from such plants;

(3) entering into new contracts or amendments to existing contracts, resulting in the installation of additional generators at hydroelectric facilities for peaking capacity beyond those currently existing or under construction;

(4) entering into agreements to construct transmission facilities to serve new thermal plants, or to provide forced-outage reserves, scheduling, load factoring and peaking capacity and the sale of surplus energy from such plants, beyond those provided for in Phase I;

(5) constructing transmission facilities for certain energy plants contemplated in Phase 2;

(6) executing on certain letters of intent sent to utility customers, in which BPA summarized the services it expected to provide under Phase 2.

Specifically excluded from coverage under the injunction were BPA's "ongoing operations." Fifty-seven construction projects and other actions were specifically listed as not being covered by the injunction.

The court stated that it would exercise continuing jurisdiction until an adequate EIS was filed.

On January 26, 1981, BPA filed a "Role EIS" with the Environmental Protection Agency.

The issue here is whether passage of the Power and Conservation Act in December 1980 warrants vacation of the judgment and dismissal of this case, and if not, whether the judgment has been satisfied by the filing of the Role EIS. In order to make the former determination, it is necessary to outline the relevant provisions in the Power and Conservation Act.

11. Section 2 of the Power and Conservation Act.

*Power and Conservation Act*

Phase 2 of the HTPP is now dead. Because of the injunction entered in this case, and for several other reasons, BPA has been unable to implement it. The Power and Conservation Act represents new Congressional authority permitting an alternative and very different approach to resolve the Northwest's energy problems.

The purposes of the Power and Conservation Act include the establishment of regional power planning for the development of an adequate, economical, efficient and reliable power supply in the Northwest; the conservation and efficient use of electric power and the development of renewable resources; the protection, mitigation and enhancement of fish and wildlife resources; and provision for environmental quality.[11]

Section 4 of the Act provides for the establishment of an eight member Pacific Northwest Electric Power and Conservation Planning Council (Regional Planning Council). The Regional Planning Council will be made up of two members from each of the states of Oregon, Washington, Idaho and Montana. It is charged with the preparation and adoption of a regional conservation and electric power plan, and a program for the protection, mitigation and enhancement of fish and wildlife. The Regional Planning Council shall not be considered a federal entity of any kind, and its members will not be federal employees.

The Regional Planning Council must approve a regional plan following public hearings, within two years of its creation. The plan, or any amendments thereto, must be approved by a majority vote of all members, including at least one vote from each state or six votes.

The Power and Conservation Act sets forth in detail the priorities which are to govern the Regional Planning Council's plan and program: Priority shall be given to resources which are cost effective. First priority in that regard shall be given to conservation; second priority to renewable resources; third priority to generating re-

sources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources. The Regional Planning Council must also develop a program for the protection, mitigation and enhancement of fish and wildlife, based upon recommendations requested from, among others, state and federal fish and wildlife agencies. That program must be adopted within one year of the receipt of recommendations.

The cost of the Regional Planning Council's plan is to be borne by BPA and included in its budgets submitted to Congress. Following the adoption of the plan, BPA must act consistently with it in acquiring new resources, including conservation. BPA's administrator is accountable to the Regional Planning Council, and his actions are reviewable by it for consistency with the regional program. That includes following the detailed objectives and requirements of the fish and wildlife program.

Sections five and six of the Power and Conservation Act set forth the specific actions the administrator of BPA must undertake in power marketing and resource acquisition respectively. BPA must enter into contracts with preference customers and investor-owned utilities (IOUs) at their requests to meet firm power needs. BPA is authorized to sell power to federal agencies in the region. It must sell power to existing direct-service industrial customers in the manner and amounts set forth in the Act. Sales to new direct-service industries are prohibited. Section five also sets restrictions on BPA's ability to sell power during periods of shortage.

As soon as practicable within nine months after the effective date of the Act, BPA must simultaneously offer initial long-term contracts to existing preference customers, IOUs, federal agency customers, electric utility customers and existing DSIs. To the extent additional power is needed to meet these initial contract requirements, BPA is authorized to use its existing short-term authority, as well as its authority under this Act to provide that power.

Section six mandates the actions BPA must take to acquire the resources necessary to meet its commitments to its customers. In resource acquisition and conservation, BPA must act consistently with the regional plan adopted by the Regional Planning Council. Before the adoption of the regional plan, the administrator may acquire resources in a manner consistent with the criteria set forth in subsections 4(e)(1) and (2); i.e., subject to the priorities and the general scheme for implementing the plan. This alternate procedure may also be used after the adoption of the plan when the administrator seeks to acquire nonmajor, as opposed to major, resources. If the administrator seeks to acquire a major resource in a manner inconsistent with the regional plan, he must first obtain specific authorization from Congress for the expenditure of funds for that purpose. However, experimental, developmental or pilot project "minor" resources may be acquired even though their acquisition is inconsistent with the plan. Before any major resource is acquired or any conservation measure implemented, BPA must submit to the appropriate congressional committees the administrative record of the decision and a statement of the procedures followed or to be followed for compliance with NEPA. The decision must be published in the Federal Register and noted in the administrator's budget made pursuant to the Federal Columbia River Transmission System Act. In arriving at a decision to acquire a major resource or to implement conservation measures, BPA must publish notice of the proposed action, and no less than sixty days later, conduct one or more evidentiary-type public hearings. The Power and Conservation Act recognizes that EISs may be required for certain acquisitions and conservation measures and provides for joint Federal-State preparation of such documents.

Section seven of the Power and Conservation Act provides for the establishment, review and revision of rates for the sale of electric energy and capacity and for the transmission of non-Federal power.

Section eight provides for the amendment of existing laws governing BPA, in order to

enable BPA to carry out the mandates of the Power and Conservation Act.

Section nine sets forth administrative provisions, relative to the contracting out of energy, subject to the provisions of other Acts; e.g., The Bonneville Project Act of 1937 and The Northwest Preference Act of 1964. It also provides that "suits to challenge the constitutionality of this Act, or any action thereunder, final actions and decisions taken pursuant to this Act . . . shall be filed in the United States court of appeals for the region."

Sections ten and eleven of the Power and Conservation Act set forth the savings provisions and effective date of the Act respectively.

*Discussion*

Defendants argue that the judgment should be vacated and the case dismissed because (1) passage of the Power and Conservation Act renders the judgment moot; (2) continued enforcement of the judgment would be inequitable in light of the changed circumstances resulting from passage of the Power and Conservation Act; and (3) the filing of a "Role EIS" in January 1981 has satisfied the judgment. I conclude that the passage of the Power and Conservation Act, as well as the demise of BPA's proposed Phase 2 of the HTPP, have rendered the judgment moot. I therefore grant defendants' motion to vacate and dismiss.[12]

The injunction entered in this case required a *programmatic* EIS to be completed by BPA before it implemented Phase 2 of the HTPP. The court made clear that "the label 'Phase 2' [is not] some sort of talisman crucial to plaintiffs' case. Phase 2 is not now and never has been a rigid, fixed plan. Thermal plant locations are likely to change, new methods for financing their construction may be devised, and a way may yet be found to provide direct-service industrial customers with low-cost power after their present contracts expire. *So long as these modifications do not change the basic concept of the HTPP, however, a programmatic EIS must be completed before BPA undertakes any further action to implement Phase 2.*" (Emphasis added).[13]

Plaintiffs contend that the Power and Conservation Act does not appreciably change the statutory scheme under which BPA operates, and that BPA retains the authority to undertake all the actions covered by the injunction.[14] Plaintiffs further contend that the Power and Conservation Act does not exempt BPA from the requirements of NEPA. Therefore, since in EIS is still required, and BPA's actions under the new statutory scheme are not appreciably different from its actions under Phase 2, the judgment is not moot and is still enforceable.

Plaintiffs' argument is untenable. Passage of the Power and Conservation Act does not merely modify the basic concept of the HTPP, it obliterates it. The statutory scheme is fundamentally and conceptually different from that contemplated by BPA under the proposed Phase 2. Whereas Phase 2 was a program planned by BPA in cooperation with its customers, the Northwest's energy needs will now be programmed by the Regional Planning Council, an entity distinct and separate from either BPA or any other federal agency. BPA will implement that program. Whether or not the implementation of the program will include acts otherwise enjoined under Phase 2 is irrelevant. The Power and Conservation Act is in part a legislative solution to the impasse created by the injunction entered in this case and other obstacles to the development of an energy program for the Northwest. To enjoin BPA's acts under the new statute because those acts are otherwise subject to an injunction involving Phase 2 would frustrate the purposes of the

---

12. I need not reach the two remaining grounds for vacation of the judgment and dismissal of the case urged by defendants. It should be noted that the record is entirely inadequate to reach a determination of whether BPA's "Role EIS" is adequate, and this opinion in no way should be construed as a favorable determination in that regard.

13. 435 F.Supp. at 602.

14. Plaintiffs' brief at pages 7 and 31.

Act. And to enjoin acts under Phase 2, a program no longer contemplated or permitted under law, serves no purpose.

It is not necessary to address what relationship BPA has to the Regional Planning Council under the Power and Conservation Act, nor is it necessary to discuss the relationship of the act to NEPA. Those are issues which undoubtedly will be litigated within the context of a challenge to the new act. It is not necessary for this court to determine whether an EIS must be filed by BPA before it engages in any action under the Act. The holding here is only that the *programmatic* EIS required to be filed by BPA before the implementation of Phase 2 is no longer necessary because of the demise of Phase 2 and the enactment of the Power and Conservation Act. The rightness or wrongness of BPA's proposed actions under the new statutory scheme, and the new plan to be developed by the Regional Planning Council, will be tested in the Ninth Circuit if and when such actions are proposed. At that time, a determination regarding the applicability of NEPA, the necessity for a programmatic or possibly site-specific EIS, and any other matter under the Power and Conservation Act, may be ripe for review.

Defendants' motion is granted.