SIERRA CLUB et al.,
Plaintiffs-Appellants,

v.

Donald P. HODEL, as Administrator of
the Bonneville Power Administration,
Defendant-Appellee.

No. 74–3366.

United States Court of Appeals,
Ninth Circuit.

Oct. 26, 1976.

William D. Rives (argued), of Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for plaintiffs-appellants.

Larry A. Boggs, Atty. (argued), of Dept. of Justice, Washington, D. C., for defendant-appellee.

Before KOELSCH and TRASK, Circuit Judges, and MURPHY,* District Judge.

TRASK, Circuit Judge:

This action was begun when the Sierra Club, the Washington Environmental Council, and the Colville Valley Environmental Council (hereafter referred to collectively as Sierra Club, plaintiff, or appellant) filed a complaint in the United States District Court for the Western District of Washington. Donald P. Hodel, Administrator of the Bonneville Power Administration (here-after Administrator), was named as defendant. The suit sought a declaratory judgment that a contract entered into by the Administrator to supply electric power to Northwest Alloys' proposed magnesium plant at Addy, Washington, was unlawful because it was executed in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and Executive Order No. 11514. It further sought injunctive relief, costs, and attorneys' fees.

The complaint alleged the interest of the plaintiffs in some detail, and their standing has not been questioned. The Bonneville Power Administration (BPA) is a federal agency created pursuant to the Act of August 20, 1937, 16 U.S.C. § 832 *et seq.* BPA is under the jurisdiction of the Department of the Interior.[1]

Because the action was based upon the National Environmental Policy Act and regulations issued pursuant thereto, jurisdiction was asserted under 28 U.S.C. § 1331 (federal question).

The contract complained of was one executed December 7, 1970, but amendatory of an earlier contract between the same parties dated June 15, 1967. The earlier agreement was between the United States Department of the Interior, acting by and through the Bonneville Power Administrator, and the Aluminum Company of America (ALCOA). It was for the sale and delivery of modified firm power by the Administrator to ALCOA for use by the purchaser at its Wenatchee and Vancouver, Washington, plants. The amendatory agreement was for the sale and delivery of interrupti-

---

* Honorable Thomas F. Murphy, Senior United States District Judge, for the Southern District of New York, sitting by designation.

1. "Legislation authorizing the construction of Bonneville Dam on the Columbia River (Act of August 20, 1937, 50 Stat. 731) provided for the establishment of the position of Administrator to dispose of electric power produced by the project. Through subsequent amendatory enactments and administrative directives the Bonneville Power Administration (BPA) has been established to carry out the mandate of the above-cited Act.

"The Administrator was authorized and directed to provide, construct, operate, maintain and improve electrical transmission facilities as needed, to facilitate the delivery of such power to then existing and potential markets. His authority is exercised subject to supervision and direction of the Secretary of the Interior—from whom his appointment is derived. The Administrator's authority has been extended, through law and Executive action, to cover power marketing from all hydroelectric power projects in the Columbia River drainage basin with the exception of one project of the Bureau of Reclamation in the State of Oregon." 1974 U.S. Code Congressional and Administrative News, Vol. 3, at 5811.

ble power by the Administrator to a plant which ALCOA proposed to build near Addy, Washington, to be used for the production of ferro-silicon and magnesium.[2]

In December 1973, after construction had begun, Sierra Club filed this action. It asserted that the Administrator was in violation of NEPA because he had not issued an environmental impact statement (EIS) for the contract, and had not reevaluated the decision to perform the contract against its environmental costs.[3]

In June 1974, the district court heard and granted Bonneville's motion for summary judgment. In October 1974, plaintiff's motion for reconsideration was denied and a judgment of dismissal was entered.

This appeal was filed in October 1974, with appellant seeking an injunction pending appeal which was denied. Appellant then sought an injunction pending appeal in this court. In February 1975, we granted appellant's motion in part by enjoining Bonneville from continuing with new clearing work on the power line corridor until a regular panel hearing this case orders otherwise.

## I. THE CONTRACT

We turn to section 102 of the National Environmental Policy Act as a point of departure for our examination. That section provides, in part, as follows:

"The Congress authorizes and directs that, to the fullest extent possible: . . (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

"(C) include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

We have emphasized, as have other courts, the language of the statute that requires all agencies "to the fullest extent possible" to include in every proposal significantly affecting the quality of the human environment a detailed statement of its impact and effects. *Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974).

The contract here under examination has three principal provisions: (1) it requires the sale of a large amount of electric power to ALCOA; (2) it requires ALCOA to construct a magnesium smelter in an agricultural area; and (3) it requires Bonneville to construct a transmission line at its expense to the plant site.[4]

---

**2.** More particularly, the magnesium plant is to be constructed and operated by Northwest Alloys, Inc., a wholly-owned subsidiary of ALCOA.

**3.** A second claim asserting a violation of the Clean Air Act was not pursued on this appeal.

**4.** "(b) The Purchaser shall construct its proposed ferro-silicon and magnesium plant in the vicinity of Addy, Washington (Addy Plant), with sufficient capacity to enable the Administrator to deliver electric power and energy hereunder in the approximate amount of 35,-000 kilowatts by 12 p. m. on September 30, 1974, and in the approximate amount of 124,-

000 kilowatts by 12 p. m. on June 30, 1976, or such alternate dates as the parties may agree to, which shall be incorporated herein by amendment.

"The Administrator, by 12 p. m. on September 30, 1974, shall construct a new Addy substation and related transmission facilities of sufficient capacity to enable the Administrator to serve the Purchaser at the Addy Plant in the approximate amount of 124,000 kilowatts (Facilities), subject to availability of funds for such construction." Amendatory Agreement No. 1 to Contract No. 14–03–63307, dated 11–18–70.

With respect to the power requirements, in the amendatory contract Bonneville agrees to deliver up to 124,000 kilowatts of interruptible power to the ALCOA plant. There are three categories of power available, each based on its particular priority. Firm power is first preference power and is to be continuously available to a purchaser; modified-firm power is second preference power and is subject to curtailment if necessary to prevent or minimize a restriction on firm power. Interruptible power carries the lowest priority and may be curtailed in whole or in part at the discretion of Bonneville; it is always subject to availability and the superior right of firm or modified-firm customers.[5]

Much of the emphasis of appellant's argument is directed to the great power requirements of the smelter and the effect of the drain of hydroelectric power consumed there on the Bonneville system. It argues that "[n]either Bonneville, nor anyone else, has prepared an environmental impact statement which considers any of the impacts of the ALCOA power sales contract on energy resources" in the Northwest. It contends that if Bonneville chose not to sell power to ALCOA, the electricity could be sold to the utilities in the Northwest to reduce possible massive energy deficits—or even could sell it to the Southwest through an intertie transmission line system connecting the Pacific Northwest with the Southwest. Thus, "[b]ecause of the ALCOA contract, Bonneville's ability to send power to the Southwest will be substantially reduced." Again, this contract "will cause the construction of thermal and nuclear generating plants" with the effect that the public will somehow subsidize the primary metal producers by having to purchase higher cost and more polluting thermal power.

In sum, the appellant principally challenges the policy decisions of the Administrator not on the basis of any direct or perceptible effect on the environment but on possible but quite speculative effects on the other parts of the BPA system. Appellant's reasoning in part is that there may be massive deficits in hydroelectric power for the system due to water scarcity or construction delay; Bonneville would have to sell power to smelters rather than to utilities for municipal use; because of lack of power utilities would have to resort to thermal or nuclear sources; those sources would cause pollution; pollution affects the environment. It is the contract itself and its ultimate effect on energy resources in the entire Northwest Region (and, to an extent, the Southwest) that gives rise to appellant's objection.[6] It is apparent from the nature of appellant's argument that even in the absence of the necessity to construct a transmission line, or for ALCOA to construct its plant, appellant would have contested the contract itself. This reduces the Administrator to the uncertain position of either requiring an EIS to be prepared before any contract for the sale of hydroelectric power, firm or otherwise, is executed, or defend in litigation; or worse, to prepare both the contract and the EIS and still suffer the litigation. It appears to us, as it appeared to the trial court, that this is not a result contemplated or within the meaning of the Act. An EIS need not discuss remote and conjectural consequences. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974).

The argument is not only tainted by uncertainty and remoteness, but is also predicated upon an inaccurate assumption of

---

5. 1967 Contract, Exhibit B thereto, section 1.4.

6. "THE COURT: Your contention here is that neither environmental statement, neither the one filed by the BPA for its activities, nor the one filed under the state act by Northwest Aloys (*sic*) gave any consideration to the power demand effect of this new construction on power problems in the northwest?

"MR. RIVES: Well, that is basically our contention, your Honor. The state environmental impact statement dealt with it very cursory. (*sic*) It pointed out that this plant would use essentially the same amount of electricity consumed by 250,000 people." R.T. at 24.

fact. The particular consequence described by appellant could not develop from a power shortage because all that the contract provides for is interruptible power. Interruptible power has no priority over the firm power to be delivered to cities; if there is no hydroelectric power remaining after prime and second-preference power commitments have been filled, then there is no interruptible power available and none is delivered.

While the court held that the Amendatory Agreement was major federal action significantly affecting the quality of human environment, requiring compliance with section 102(2)(C) of NEPA, it also stated that "the contract itself is not in violation of public policy or statute." Read in conjunction with the transcribed record of oral proceedings on the motion for summary judgment, it is clear that the court was referring to and rejecting the argument that the contract was in violation of NEPA because it was not accompanied by an environmental statement showing the interrelationship between the power allotment to ALCOA and other power allotments to users in other regions of the system, and even to those outside the system under the Pacific Northwest-Southwest intertie agreement. This is the principal contention of appellant under its three-part argument. No case law has been submitted which supports this expansive reading of the Act, and we have found none. As pointed out by appellant, the Federal Columbia River Power System consists of a network of high-voltage transmission facilities serving as the main power grid for the Pacific Northwest and providing approximately 80 percent of the region's power transmission capacity. Over this grid Bonneville wholesales electric power to customers in Washington, Oregon, Idaho, and Montana, an area of approximately 300,000 square miles, with an intertie arrangement with the Southwest.

*Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), helps us answer the question. The defendants were officials of the Department of the Interior and officers of other agencies responsible for granting coal leases, approving rights-of-way, and taking other action necessary to enable private companies to develop coal reserves on land of the federal government. The plaintiffs were environmental organizations. They described an area known as the "Northern Great Plains region," and alleged that the federal officials could not allow further development without preparing a comprehensive environmental impact statement on the entire region. Reversing a district court judgment, the Court of Appeals had sustained the contentions of the plaintiffs. *Sierra Club v. Morton,* 169 U.S. App.D.C. 20, 514 F.2d 856 (1975). The issue before the Court was whether the Interior Department officials and other government officers like them were required to prepare an environmental impact statement on the entire region. The Court, relying upon the language of section 102(2)(C), held that they were not. The Court observed that there was no proposal for major federal action with respect to the region, and there was no proposed legislation of regional nature.

"Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in respondents' region, and thus impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity. A regional plan would define fairly precisely the scope and limits of the proposed development of the region. Where no such plan exists, any attempt to produce an impact statement would be little more than a study . . . containing estimates of potential development and attendant environmental consequences. There would be no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA." *Kleppe v. Sierra Club, supra,* at 402, 96 S.Ct. at 2727.

■ The Court likewise rejected an argument that an EIS was required where there were several projects because they were "intimately related." *Id.* at 408–415, 96 S.Ct. 2718. In the case now before us, although

there is a general "Pacific Northwest" region to which Bonneville supplies a great amount of hydroelectric power, there is no record showing of a master plan for development of the region. The Bonneville Project simply provides authority to the Administrator to market power not necessary to operate the project and the navigation facilities employed in connection therewith. 16 U.S.C. § 832. Here, as in *Kleppe v. Sierra Club, supra*, there is reference to other contracts with industry but not on a regionally organized basis. Although power is to be sold for the benefit of the public and particularly of domestic and rural consumers with preference and priority to public bodies and cooperatives, 16 U.S.C. § 832c, there is no regional plan of development either by geographical area, by customer, or by percentage of total power generation capacity. We affirm the judgment of the district court in its decision that no environmental impact statement was required in order to show the energy effect of this contract upon all other contracts or energy users of the Bonneville project.

## II. PLANT and TRANSMISSION LINE

In addition to the region-wide energy resource argument that appellant makes, the other two parts of appellant's argument relate to the construction of the magnesium plant and the installation of the right-of-way. Were the events which took place in 1970 to take place now, in view of the Council on Environmental Quality (CEQ) guidelines [7] and the case law which has developed, the conclusion would be foregone. NEPA became effective on January 7, 1970. CEQ guidelines were not issued

until April 1971. The first important NEPA statutory construction case was not decided until July 23, 1971.[8] Bonneville asserts in its brief that it concluded that the appropriate time for preparation of its EIS was before funding and before performance, "which it believed to be the *action* affecting the environment." We do not gainsay the comment. Indeed, appellant may have shared the view since it did not file its action until December 1973. Nevertheless, the statute had been enacted, had become effective, and was binding on appellee on December 7, 1970, when its contract was formally executed, and its requirements should have been recognized. BPA was aware of the Act and its requirements and, in fact, in December 1970, filed an "environmental statement" stating that:

"[w]e have taken our entire program as a single major Federal action and have prepared this Statement on that basis. Individual facilities are examined as components of this total program."

Although this environmental statement was comprehensive, it contained no reference to the ALCOA project. This could be taken as lending credence to its assertions that Bonneville did not view projects that were still on "the drawing boards" as being NEPA material.

The impact statement for the following year was sent to CEQ in draft form on August 30, 1971, covering the program for the fiscal year 1973. This statement did refer to "Addy Service to ALCOA" and was circulated to 16 federal, 43 state, and 86 local agencies for review and was made generally available.[9] A public meeting was held at Chewelah, Washington, on Septem-

---

7.  36 Fed.Reg. 7724 (1971).

8.  *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

9.  "Pursuant to the National Environmental Policy Act of 1969, notice is hereby given that the Bonneville Power Administration has prepared a draft statement which discusses environmental considerations relating to BPA's projected program for fiscal year 1973.

"Copies of the BPA Draft Environmental Statement have been sent to Federal, State,

and local agencies as outlined in the Council on Environmental Quality guidelines of April 23, 1971. The Draft Environmental Statement is also available for review in the library of the headquarters office of BPA, 1002 Northeast Holladay Street, Portland, Or 97208, the Washington, D.C., Office in the Interior Building, Room 5600, or in the following Area and District Offices: Idaho Falls, Idaho; Portland, Oreg.; Seattle, Wash.; Spokane, Wash.; Walla Walla, Wash.; Eugene, Oreg.; Kalispell, Mont.; and Wenatchee, Wash.

ber 14, 1971, to discuss the Addy proposal, and a public meeting was held at Portland, Oregon, on September 29, 1971, to discuss the entire Bonneville program as it related to environmental concerns. The final EIS for fiscal 1973 was submitted to CEQ on March 29, 1972, and was also provided to federal, state, and local agencies and made available to the public.[10]

In 1972, the Addy service proposal was again covered in Bonneville's environmental impact statement. The draft was filed with the Council on Environmental Quality and was circulated to approximately 150 federal, state, and local agencies and made available to the public.[11] In connection

> "A public meeting will be held September 29, 1971, in the auditorium of the Bonneville Power Administration headquarters building. It will be preceded by a number of preliminary meetings at selected locations throughout the Pacific Northwest area served by BPA. The purpose of the meetings is two fold: To present to the public BPA's projected fiscal year 1973 program, and to elicit comments from the public with respect to the environmental impact of BPA's projected program.
> "Dated: August 19, 1971.
> "H. R. RICHMOND,
> Administrator"
> Notice of Availability, 36 Fed.Reg. 17057, August 27, 1971.

**10.** See Notice of Availability, 37 Fed.Reg. 6875, April 5, 1972.

**11.** Notice of Availability of Draft Environmental Statement, 37 Fed.Reg. 21657, October 13, 1972.

**12.** Notice of Availability of Final Environmental Statement, 38 Fed.Reg. 9098, April 10, 1973.

**13.** "Bonneville Power Administration is requesting appropriations to cover operation and maintenance of its transmission system and construction of additions and modifications to this system during fiscal year 1974.

"These system maintenance and construction activities must be carefully planned and carried out on a coordinated basis to preserve system integrity. Individual actions cannot be effectively viewed in isolation, but must be considered in the context of the entire program. Further, the impacts of the individual actions are in many cases cumulative. Accordingly, the entire proposal for the

with this draft, another meeting was held at Chewelah on November 9, 1972, for the purpose of additional discussion of the Addy proposal. Following comments, the final draft was circulated and made public.[12]

The format of the final environmental impact statement, dated April 3, 1973, is a document of 254 pages plus supplements containing particularized information. The main portion of the record is addressed to Bonneville's entire program; the supplements cover individual projects.[13] Indicative of the scope of the general EIS is its Table of Contents covering each of the components of the statement required by NEPA section 102(2)(C).[14]

> Fiscal year 1974 Environmental Statement is covered by the following Environmental Statement.
> "We recognize, however, that decisions on individual components of the proposed program also have environmental importance. For this reason, narrative and map data on individual proposals and alternatives are provided in the Facility Evaluation Supplement which is an integral part of this Statement and is incorporated here by reference. Supplemental information on specific aspects of the program is included in the attached appendix.
> "This Statement was prepared in compliance with the National Environmental Policy Act of 1969 (P.L. 91–190) and follows the guidelines established by the Council on Environmental Quality (Federal Register, Volume 36, Part III, Pages 7724–7729, April 23, 1971)."
> Environmental Statement, Fiscal Year 1971 Proposed Program, U.S. Department of the Interior, Bonneville Power Administration at 1.

**14.** "ENVIRONMENTAL STATEMENT
TABLE OF CONTENTS

| | | |
|---|---|---|
| | Summary | i |
| I. | Introduction | 1 |
| II. | Description of Proposed Program | 1 |
| III. | Description of the Existing Environment | 4 |
| IV. | Probable Impact of Proposed Program on the Environment | 8 |
| V. | Mitigating Measures Included in the Proposed Program | 9 |
| VI. | Unavoidable Adverse Environmental Impacts | 28 |
| VII. | Relationship Between Local Short-Term Uses of The Environment and Long-Term Productivity | 29 |
| VIII. | Irreversible and Irretrievable Commitments of Resources | 30 |
| IX. | Alternatives | 31 |
| X. | Consultation and Coordination with Others | 43 |

Appendix B of this document contains copies of comments from government agencies and the public with respect to the statement. There are 62 such comments including nine from branches of the United States Department of the Interior, two from branches of the United States Department of Agriculture, and one each from the United States Environmental Protection Agency, Region X, the Federal Power Commission, the United States Atomic Energy Commission, the United States Department of Housing and Urban Development, and the United States Department of the Army. Among the public responses were three representing the Sierra Club (none of which commented on this project) and a number of comments from towns and organizations in the Addy area (commenting upon the ALCOA project, none unfavorably).

The general document, as its Table of Contents indicates, contains illustrative maps and concerns itself with a description of the existing environment covering topography, climate, land ownership, population, land use, recreation, and fish and wildlife. It considers the probable impact of the transmission lines on this environment and concludes with selective comments received during the review process with its responses thereto. Several comments from the Sierra Club and responses thereto are set out.

The supplement addressed to the Addy Project alone contains 34 pages of textual matter plus illustrative maps showing Land Use Evaluation, Physical Sensitivity Evaluation (erosion potential), and Natural and Cultural Evaluation (one covering fish and wildlife habitat and the other recreation areas). It constricts its focus to the area of the proposed transmission line and considers all alternatives, including that of non-construction. The transmission line as proposed is a 25.16 mile, 230,000-volt, single-circuit line. The supplement also devotes about one and one-half pages to a discussion of the proposed silica-magnesium plant to be constructed by Northwest Alloys for ALCOA.

During the year 1971 ALCOA applied to state agencies for a permit to appropriate ground water near Addy and disclosed its interest in constructing a magnesium plant there. Concurrently, its subsidiary Northwest Alloys also sought permits from various state agencies having jurisdiction of different activities necessary to plant construction. The Department of Ecology of the State of Washington (WDE), having jurisdiction over air emissions and treatment of permanent waste, was thus prompted to make its environmental study.

"In compliance with the National Environmental Policy Act of 1969 (NEPA) and the State Environmental Policy Act of 1971 (SEPA), the Department of Ecology, prior to taking any action, has examined the proposal and its probable environmental consequences. The determination was made that the proposed plant and mining facilities would generate significant impact on the existing environment. Thus, in accordance with NEPA and SEPA, the decision was reached that an environmental evaluation should be conducted and that an environmental impact statement should be prepared and submitted to the public prior to any related action being taken by the Department of Ecology that would allow portions of the proposed action to proceed." Draft: Environmental Impact Statement, May 1, 1973, Washington State Department of Ecology.

In its 307 page and 442 page addenda of August 1973, which together constituted its final EIS, WDE considered all environmental aspects of the proposed plant including air quality, noise, odor, waste, water, land

Footnote 14—Continued

APPENDIX A—SUPPLEMENTAL INFORMATION ON MAINTENANCE AND CONSTRUCTION PROGRAMS
APPENDIX B—COMMENTS FROM GOVERNMENT AGENCIES AND THE PUBLIC

SUPPLEMENT — FACILITY EVALUATIONS"

Environmental Statement, Fiscal Year 1971 Proposed Program, U. S. Department of the Interior, Bonneville Power Administration "Table of Contents."

use, social effect, economic effects, recreation, and alternatives. Its final report was circulated to the Sierra Club, Department of the Interior, and numerous federal, state and local agencies. On December 11, 1973, WDE issued its order of approval of the construction of the plant at Addy.

■ The work of WDE appears to have been comprehensive and careful. The addenda covered all of the requirements of section 102(2)(C) with regard to environmental impact statements and was circulated to interested agencies, federal and state, and to the public. Had it been the work product of the federal agencies or had there been evidence that the CEQ or the Administrator of NEPA considered it, approved it, and thereby adopted it as their own, or had the federal officials participated in its preparation, the state report supplementing the inadequate federal report might well have been sufficient. *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Citizens Environmental Council v. Volpe*, 484 F.2d 870, 873 (10th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *cf. Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). But the responsibility of WDE is to the State of Washington and not to the Council on Environmental Quality or the Administrator of the Environmental Protection Agency. By entering into a contract to supply the power to the project and to construct the transmission line to the plant, the agency has so federalized the entire project that it has become "major Federal action" requiring a federally responsible environmental impact statement. *National Forest Preservation Group v. Butz*, 485 F.2d 408 (9th Cir. 1973).

■ The one and one-half page reference to the construction and operation of the magnesium plant in the BPA report is woefully short of a "systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in decision-making which may have an impact on man's environment." NEPA, section 102(A). It does not even purport to cover the criteria made mandatory by section 102(2)(C). In contrast, the state EIS considers each one, discusses it, and presents to the reader a clear understanding of the environmental factors involved. We attach no bad faith to BPA's shortcoming. The state of the legal art with respect to NEPA was then developing. Our decision in *National Forest Preservation Group v. Butz, supra*, was not announced until September 1973. It is clear from the impact statements filed by BPA, where the responsibility of the agency was clear, that it had no intent to evade its duties. Yet, constrained by *Butz*, it is clear that an EIS must be filed by the federal agency as to the magnesium plant.

In summary, we are in agreement with the district court as to the adequacy of the compliance by BPA with NEPA insofar as the contract itself and the construction of the transmission line are concerned, and the order heretofore entered enjoining further clearing work on the transmission line portion of the project is hereby vacated. We disagree with the district court, however, as to the need of the federal agency to consider the plant as a part of the project and to prepare an environmental impact statement covering it. The action of the trial court is therefore reversed as to the magnesium plant, and the case is remanded with instructions to direct a stay of any further construction of that feature of the project until an environmental impact statement has been prepared and submitted to the court which will qualify under the National Environmental Protection Act.[15]

Each party will bear its own costs herein.

---

**15.** Although reliance upon Executive Order No. 11514, 35 Fed.Reg. 4247 (March 5, 1970), was alleged in the complaint and mention of it was made in a written motion to the district court, the order has not been alluded to in the briefs and arguments before this court. Therefore, we do not consider it on this appeal.