**PORT OF ASTORIA, OREGON, an Oregon Municipal Corporation, Concerned Citizens of Clatsop County, an Unincorporated Association, Dorothy Reikkola and Robert A. Fackler, Plaintiffs-Appellants-Cross Appellees,**

v.

**Donald Paul HODEL, Administrator of the Bonneville Power Administration, and Alumax Pacific Corporation, a Delaware Corporation, Defendants-Appellees-Cross Appellants.**

Nos. 75–3465, 75–3621, 75–3699 and 76–1049.

United States Court of Appeals, Ninth Circuit.

March 5, 1979.

Rehearing Denied May 7, 1979.

Diarmuid F. O'Scannlain (argued), Portland, Or., Larry Gutteridge (argued), Portland, Or., for plaintiffs-appellants-cross appellees.

James P. Rogers (argued), of Davies, Biggs, Strayer, Steol & Boley, Portland, Or., for defendants-appellees-cross appellants.

Before KENNEDY and TANG, Circuit Judges, and JAMESON,* District Judge.

TANG, Circuit Judge.

This case consists of appeals and cross appeals from a judgment that held a power supply contract between the defendants valid, but unenforceable, until the contract's implications had been assessed in environmental impact statements (EIS's) pursuant to section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. The contract (referred to herein as the "Umatilla contract") obligates the Bonneville Power Administration (BPA) to supply electrical power to an aluminum reduction plant that Alumax Pacific Corporation (Alumax) plans to build and operate in Umatilla County, Oregon. The plaintiffs claimed that the execution of the contract was major federal action under § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), for more reasons than BPA's commitment to supply power to one large industrial site. Their contentions covered a broad area that runs from the contract's ultimate consequences in Umatilla County and Clatsop County, Oregon to the effect on power allocation and availability caused by new "industrial firm power contracts" and their relation to a long term power policy known as "Phase 2 of the Hydro Thermal Power Program." The plaintiffs requested the district court to avoid the contract in its entirety. But, although the court ordered compliance with NEPA, it did not declare the contract void. For the reasons that follow, we affirm the judgment of the district court.

## I. BACKGROUND

### A. BPA's Role in the Scheme of Power Distribution in the Pacific Northwest

BPA, a federal agency established in 1937 pursuant to the Bonneville Dam Act, 16 U.S.C. §§ 832–832*l*, markets the electrical power generated by the federal dams on the Columbia River. Its service territory extends over Oregon, Washington, Idaho, and that part of Montana west of the continental divide. BPA sells approximately 50 percent of the electrical power used in this region and provides approximately 80 percent of the region's high voltage transmission.

BPA sells its power in various grades through formal contracts with its different customers. As relevant here, these customers include industrial users and publicly and cooperatively owned nonfederal utilities. Under 16 U.S.C. § 832c(a), the utilities are preference customers. The grade of power sold reflects BPA's contractual ability to restrict under defined circumstances the amount of power supplied to a customer. The highest grade of power is "firm power." This is a preference power that, apart from unavoidable circumstances, must be continuously supplied. At the opposite end of the power scale is "interruptible power," generated at times of high water flow or lower power demands and subject to restriction at BPA's discretion. Between these two extremes are other grades of power that vary according to BPA's right to restrict supply. All restrictable grades of power play an important role in the scheme of power distribution because the contractual right to restrict delivery provides a source of reserve power that can be applied to fulfillment of firm power needs.

BPA is required to meet its preference customers' electrical load growth until 1983. However, in 1968 BPA and the region's nonfederal utilities predicted that BPA's existing hydroelectric generating facilities would be insufficient to meet projected growth because the Columbia River's generating capabilities have been almost fully exploited. Accordingly, they embarked upon a cooperative enterprise now known as "Phase 1" of the Hydro Thermal Power Program. Under Phase 1, the nonfederal utilities would create new power sources by

---

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

building thermal generating plants. The output of these plants would then be purchased by BPA, melded with its hydroelectric power, and sold to its customers at a pool rate. This arrangement would provide a market for the utilities' new power. Seven Phase 1 thermal generating plants are under construction. However, much of the mechanism of Phase 1 became unfeasible largely because, under a new Treasury regulation, the bonds issued for construction of thermal plants lost their tax exempt status.[1]

In response to Phase 1's problems, "Phase 2" of the Hydro Thermal Power Program was formulated between BPA, its industrial customers, and nonfederal public, cooperative, and investor-owned utilities. The program was then announced in a press release of December 1973. Broadly, Phase 2 is a cooperative effort that contemplates the construction of thermal generating plants in addition to those initiated under Phase 1. Two of Phase 2's principal problems are how the thermal facilities are to be financed and how power reserves are to be maintained to meet firm power commitments. The resolution of these problems entails a change in BPA's role from purchaser of the nonfederal utilities' thermal output to sales agent for this output among BPA's industrial customers.[2] It also entails the alteration of BPA's relationship with its industrial customers through the introduction of "industrial firm power contracts" that provide for delivery of "industrial firm power." This latter term does not define one particular grade of power. Rather, it denotes a new method or structure for distributing power to industry.

In the past, it has been BPA's policy to obtain from industry a portion of the reserve power used as backup for its firm power commitments by providing industrial customers with restrictable grades of power. The reliance on industry increased under Phase 1 in order to protect firm power commitments in the event that construction of thermal plants fell behind schedule or the plants initially operated below capacity. In 1971 BPA adopted an industrial sales policy that eventually came to fruition in December 1974 with the introduction of the proposed industrial firm power contracts. Under these contracts, BPA divides an industrial customer's contractual power demand into four "quartiles" of power of varying grades that, on the whole, constitute a lower or more restrictable grade of power than that which BPA provides under existing industrial contracts due to expire in 1981–86. In addition, the third quartile of these contracts embodies a specific Phase 2 element in that it allows BPA at a future date to require the industrial customer either to shift the source of power provided under the third quartile from BPA to a nonfederal Phase 2 thermal generating plant or to accept from BPA a lower grade of power for that quartile. Although the industrial firm power contracts provide a more restrictable grade of power, BPA seeks to make them attractive by offering to extend their term to 1994.

Industrial firm power contracts have several functions. The generally more restrictable grade of power provided in the quartiles other than the third quartile allows BPA to expand its reliance on industry for BPA's own reserve power necessary to meet possible difficulties in fulfilling BPA's contractual firm power commitments through 1983. On the other hand, the third quartile aims at the independence of thermal generating plants by obtaining from industry an advance market for the plants' output. This market helps to finance the plants and allows the nonfederal utilities to build thermal plants larger than those dictated by present demands. Further, if an

---

1. In addition, BPA planned to bill utilities participating in thermal plants and providing BPA with thermal power by subtracting the amount of power they sold to BPA from the amount of power they purchased from BPA's pool. Due to the higher cost of thermal power, this billing method became uneconomical for BPA.

2. These customers purchased 40 per cent of BPA's own output in 1974, the year before this suit commenced.

industry elects not to shift the source of the power provided in the third quartile, BPA's right to restrict the power in that quartile aids in creating a regional reserve of power that can be distributed to nonfederal utilities whose thermal plants may be behind schedule or operating below capacity.

## B. *BPA and Alumax*

In 1966, BPA and Northwest Aluminum Company entered into a contract for the supply of power to an aluminum reduction plant to be built on Guemes Island in the State of Washington. An amendment to the contract provided for delivery of power to a new proposed plant site at Warrenton in Clatsop County, Oregon. In September 1970 the contract was assigned to Alumax, then known as Amax Pacific Corporation. In its final form, the contract (referred to herein as the "Warrenton contract") provided the proposed plant with a contract demand of 240 megawatts.[3] BPA also planned on the delivery of an additional 80 megawatts of interruptible power.[4] Thus, the proposed plant's capacity would have been 320 megawatts.

Plans for building the Warrenton plant proceeded and Alumax filed applications for permits with the Oregon Department of Environmental Quality. However, in late 1974 the Oregon Environmental Quality Commission began to consider a proposal to declare the area of the Warrenton site (the Youngs Bay Estuary) a special problem area in which fluoride emissions would be forbidden. Alumax cannot build an aluminum reduction plant that does not emit fluorides. Alumax, therefore, decided to relocate the proposed plant to another site. Its decision was facilitated by BPA's willingness to deliver power to a plant to be built in Umatilla County. Consequently, in March 1975 BPA and Alumax executed the contract in question in this case (the "Umatilla contract") and Alumax withdrew its permit applications for the Warrenton site.

The Umatilla contract provides for a contract demand of 320 megawatts. It is also the first executed industrial firm power contract and contains a third quartile provision as described above. None of BPA's other industrial customers have executed industrial firm power contracts although they are operating under provisions like those of the Umatilla contract through letter agreements with BPA terminable by either party on 30 days' notice. The Umatilla contract provides that the contract's term will be extended from 1986 to 1994 as soon as one other industrial customer executes a formal industrial firm power contract.

## C. *The Proceedings Below*

This suit was filed on the day the Umatilla contract was executed. The plaintiffs in the district court were the Port of Astoria (the "Port"), an Oregon municipal corporation and port district organized pursuant to Or.Rev.Stat. §§ 777.005–777.990; Concerned Citizens of Clatsop County ("Concerned Citizens"), an unincorporated association purporting to represent the environmental interests of its members; Hermiston Broadcasting Co. ("Hermiston"), an Oregon corporation with commercial radio transmission facilities in Umatilla County; and five named individuals who were either members of Concerned Citizens or residents of Umatilla County.[5]

The plaintiffs alleged that, under § 102(2)(C) of NEPA, the execution of the Umatilla contract required an EIS because it was major federal action in the following respects:

1. It changed the site of the proposed plant from the Warrenton site in Clatsop County to a distant location in Umatilla County.

2. It enabled the construction and operation of the Umatilla plant and the transmission lines necessary to service it.

---

**3.** A "megawatt" equals 1,000 kilowatts.

**4.** At the time of the contract's formulation, it was BPA's policy not to include interruptible power in the formal contract power demand.

**5.** Hermiston and three of the individually named plaintiffs have neither appealed nor otherwise appeared in this court.

3. It obligated BPA to supply Alumax with a large amount of power in a time of forecasted power deficits.

4. It was the first industrial firm power contract and it contained a third quartile provision. It therefore initiated Phase 2 of the Hydro Thermal Power Program.

The district court refused to issue a temporary restraining order to enjoin the execution of the contract. After a nonjury trial and related conferences and hearings, the court held that the contract was valid but unenforceable until BPA had prepared and circulated an EIS, and, after having considered the EIS, reaffirmed the decision to execute the Umatilla contract on the basis of the environmental alternatives available to BPA immediately prior to the execution of the contract including delivery of power to the Warrenton site. It further ordered that the EIS include a consideration of the Phase 2 aspects of the contract. In addition, the court dismissed the Port of Astoria's complaint for lack of standing. Finally, the court retained jurisdiction in order to resolve controversies concerning the implementation of the judgment, including controversies relating to the adequacy of any EIS.

## II. DISCUSSION

### A. Standing

In both the district court and this Court, BPA and Alumax have attacked each plaintiff's standing to bring suit. The plaintiffs assert that they have standing under § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, providing in relevant part that a person "adversely affected or aggrieved by agency action within the meaning of the relevant statute" may seek judicial review of the agency action. To show that he has standing to seek such review, however, a plaintiff must allege that the agency action has caused him an "injury in fact" and that this injury is "arguably within the zone of interests to be protected or regulated" by the statute that the plaintiff claims the agency violated. *Association of Data Processing Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Sierra Club v. Morton*, 405 U.S. 727, 732–33, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (suit brought under § 10 of the APA), the Supreme Court has clarified the "injury in fact" prong of the APA standing test. We have stated on the basis of these cases that:

> Compactly put, the test for standing . . . is that the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought.

*Bowker v. Morton*, 541 F.2d 1347, 1349 (9th Cir. 1976) (NEPA claim raised). *See also Starbuck v. City and County of San Francisco*, 556 F.2d 450, 457–59 (9th Cir. 1977). The requirement that there be an actual or threatened "injury in fact" is mandated by article III of the Constitution. However, the "zone of interests" prong of the APA standing test is a nonconstitutional prudential limitation on the exercise of jurisdiction. *Simon, supra*, 426 U.S. at 39 n.19, 96 S.Ct. 1917.[6]

6. The Supreme Court's recent discussions of standing have centered for the most part on article III's requirement of an "injury in fact." *Warth* and *Simon, supra*. The "zone of interests" requirement, however, has received only passing mention. *Simon, supra*, 426 U.S. at 39 n.26, 96 S.Ct. 1917. *See also Sierra Club v. Morton*, 405 U.S. 727, 733 n.5, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Nonetheless, case law indicates that the requirement is applicable to suits brought under NEPA. *United States v.* *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686 n.13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *Cf. Bowker, supra*, 541 F.2d at 1349 ("zone of interests" requirement noted, but not applied because there was no injury in fact). Further, the requirement has vitality in cases brought under § 10 of the APA. *Starbuck, supra*, 556 F.2d at 457–58; *Sierra Club v. Morton, supra*, 405 U.S. at 733, 92 S.Ct. 1361.

## 1. *Port of Astoria*

■ The Port is a port district located wholly within Clatsop County which lies in a part of Oregon at some distance from Umatilla County. The Port alleged that the change in the Alumax plant's site would cause it to suffer losses of potential tax base and potential revenue, loss of a financial guarantee for purchase of a new dock facility, and loss of approximately $250,000 out-of-pocket expenses. These alleged injuries represent only pecuniary losses and frustrated financial expectations that are not coupled with environmental considerations because they are caused solely by the relocation of the Alumax plant from Clatsop County to Umatilla County. Consequently, the alleged injuries are outside of NEPA's zone of interests and are not sufficient to establish standing. *Realty Income Trust v. Eckerd*, 183 U.S.App.D.C. 426, 431, 564 F.2d 447, 452 (1977); *Robinson v. Knebel*, 550 F.2d 422, 424–25 (8th Cir. 1976); *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir. 1976); *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 374 F.Supp. 450 (D.Md.1974), *aff'd*, 510 F.2d 1037 (4th Cir.), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975).

■ In addition to advancing pecuniary injuries, the Port asserts that its statutory power to formulate rules and regulations to prevent estuary and stream pollution within the boundaries of its district (Or.Rev.Stat. § 777.120(2)) encompasses a concern with the proposed Umatilla plant's increasing the fluoride content in the Columbia River where it flows in Clatsop County. From this premise, it argues that it has been injured because the failure to prepare an EIS on the Umatilla contract has deprived it of an opportunity to participate in the administrative decisionmaking process. § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

For this argument, the Port relies on *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975), where the City of Davis was found to have standing to compel the preparation of an EIS on the proposed construction of an interstate freeway exchange outside the city's limits. Because California law required the city to formulate a general plan that should include development and enforcement of environmental standards, this Court concluded that the city was a "local agency" under § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and entitled by the statute to comment on any EIS concerning the proposed interchange. On this basis, the Court held that failure to file an EIS deprived the city of this entitlement and that the deprivation constituted an injury sufficient by itself to give the city standing.

The City of Davis's standing depended upon its characterization as a "local agency" authorized "to develop and enforce environmental standards." § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). The Port, however, cannot be so characterized. In commenting upon the term "local agency," the Conference Report on NEPA, approved by both Houses of Congress, states:

> With regard to State and Local agencies, it is not the intention of the conferees that those Local agencies with only a remote interest and which are not primarily responsible for development and enforcement of environmental standards be included.

H.R.Rep.No.91–765, 91st Cong., 1st Sess. at 8, *reprinted in* [1969] U.S.Code Cong. & Admin.News pp. 2751, 2767, 2769. Moreover, regulations of the Council of Environmental Quality refer to "state and local environmental agencies." *See* 40 C.F.R. § 1500.9(c) (1977). The Port, however, cannot be considered to be primarily responsible for environmental quality. It has numerous duties regarding navigation and commerce including the improvement of bays, rivers, and harbors and the construction of port facilities, canals and waterways. *See, e. g.,* Or.Rev.Stat. § 777.105. Further, unlike the City of Davis, the Port is not required to develop and enforce environmental standards. Rather, under Or. Rev.Stat. § 777.120(2), the Port may make,

establish, change, modify, or abolish regulations on stream pollution.

In conclusion, the district court properly dismissed the Port's complaint for lack of standing.

### 2. *Concerned Citizens of Clatsop County and the Individual Plaintiffs Residing in Umatilla County*

■ Concerned Citizens and the individual plaintiffs alleged ecological and aesthetic injuries resulting from the construction and operation of the Alumax plant in Umatilla County. They also advanced economic and social injuries that are directly brought into play by the plant's possible existence. Thus, they have alleged that the plant will cause a diminution in Umatilla County's existing water supply, an increase in the deposit of solid wastes, the emission of fluorides and other pollutants into the air and the Columbia River, impacts upon agriculture, wildlife and the enjoyment of recreational facilities, and demographic upheaval attended by housing, schooling, and traffic problems.

■ Concerned Citizens and the individual plaintiffs who reside in Umatilla County have standing on the basis of these injuries. The Umatilla County residents and some members of Concerned Citizens live, work, and/or spend leisure time in Umatilla County. Thus, they can be expected to suffer the alleged injuries. Concerned Citizens is clearly a proper representative of its members. *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197; *Sierra Club v. Morton, supra,* 405 U.S. at 734–41, 92 S.Ct. 1361. Further, the injuries are within NEPA's

zone of interests. *Cady v. Morton,* 527 F.2d 786, 790 n.1, 791 (9th Cir. 1975). *See also Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522–23 (5th Cir. 1978).[7]

### 3. *Hermiston Broadcasting Company*

■ Hermiston alleged its ownership of radio broadcast facilities in Umatilla County. It further alleged that the transmission lines to be built for servicing Alumax's Umatilla plant would interfere with its broadcasts. The injury may be classified as economic. Nonetheless, the injury is the immediate and direct result of the building of the Alumax plant, an action that "will have a primary impact on the natural environment." *See Image of Greater San Antonio v. Brown, supra,* 570 F.2d at 522. In this respect, NEPA and Hermiston—and, indeed, Concerned Citizens and the Umatilla County residents—share a common interest in the proposed construction of the Alumax plant in Umatilla County. Moreover, Hermiston's injuries, unlike the Port of Astoria's economic injuries, are causally related to an act that lies within NEPA's embrace. *National Helium Corp. v. Morton,* 455 F.2d 650 (10th Cir. 1971). *See also Gifford-Hill & Co. v. Federal Trade Commission,* 73 U.S.App.D.C. 135, 523 F.2d 730 (1975).

### B. *Major Federal Action*

NEPA requires that an EIS be prepared before implementation of "major Federal actions significantly affecting the quality of the human environment." § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). Having con-

---

7. Concerned Citizens also sought to advance Clatsop County's socio-economic interests. It alleged that a plant at the Warrenton site would have resulted in various benefits including new jobs, an increase in Clatsop County's per capita income, an influx of new population, and additional substantial tax revenues that could have been applied to upgrading public facilities. The County's loss of the Alumax plant entails loss of these benefits. Nonetheless, the injuries are insufficient to establish standing. Like the Port's pecuniary injuries, they are caused only by the relocation of the Alumax plant in Umatilla County and are not coupled with environmental considerations.

*See Image of Greater San Antonio v. Brown, supra,* 570 F.2d at 522. Moreover, one court has held that NEPA does not vindicate the economic and social consequences of the relocation of a government installation from one community to another. In that case, the plaintiffs anticipated a worsening of their community's socio-economic conditions. *Breckenridge v. Rumsfeld,* 537 F.2d 864 (6th Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). The *Breckenridge* rationale is at least applicable here where the anticipated harm amounts to frustrated expectations with no change in the socio-economic status quo.

sidered the issues of standing, we now turn to whether such "major federal action" exists in this case.[8]

### 1. Construction of the Umatilla Plant and the Transmission Lines Necessary to Service It

BPA argues that it is not obligated to prepare an EIS on the Umatilla plant because its commitment to supply Alumax with power arose at least at the time of the execution of the Warrenton contract and is, therefore, a continuing commitment that antedates the enactment of NEPA. BPA's argument must be rejected.

■ This Circuit has held that an EIS is required to assess a major federal project initiated before the effective date of NEPA when the project entails a further major action that would occur after NEPA's effective date and that would significantly affect the quality of the human environment. *San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1024 (9th Cir. 1973); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1282–83 (9th Cir. 1973). The proposed construction of Alumax's Umatilla plant falls squarely within this holding. Even assuming that the Warrenton contract established BPA's continuing legal obligation to supply power to Alumax at some time and in some place, the 1975 Umatilla contract allows Alumax to change the site of its proposed plant from Clatsop County to Umatilla County. In terms of environmental consequences, this change in location initiates what is, in effect, an entirely new project affecting an area not contemplated in earlier contracts between BPA and Alumax or its predecessors. Moreover, there is no dispute that the Umatilla plant will significantly affect the human environment of Umatilla County. BPA shares responsibility for the environmental effects because its contractual obligation to supply Alumax

with power enables Alumax to build the plant and requires BPA to erect transmission lines. Under similar circumstances, we have held:

> By entering into a contract to supply the power to the project and to construct the transmission line to the plant, the agency has so federalized the entire project that it has become "major Federal action" requiring a federally responsible environmental impact statement. *National Forest Preservation Group v. Butz*, 485 F.2d 408 (9th Cir. 1973).

*Sierra Club v. Hodel*, 544 F.2d 1036, 1044 (9th Cir. 1976).

In sum, BPA must prepare an EIS on the Umatilla plant and transmission lines. Without it, the environment of a county that suddenly found itself to be the site of the Alumax project would go without NEPA's protection.

### 2. Phase 2 and the Umatilla Contract

■ In addition to the major federal action represented by the construction of the Umatilla plant and the transmission lines to it, the execution of the Umatilla contract is major federal action because it creates a new commitment of BPA's energy resources and sets the stage for the initiation of Phase 2 of the Hydro Thermal Power Program. These two effects of the contract are inseparably intertwined in that the power commitment to Alumax has been made by way of the first executed industrial firm power contract. Thus, service to Alumax will be integrated with Phase 2. In these circumstances, we think it appropriate that BPA prepare an EIS on industry's role in Phase 2 and that the EIS include an assessment of the new energy commitment to Alumax.[9]

The record shows that Phase 2 is a regional proposal for development and distri-

---

8. The effects of the execution of the Umatilla contract on socio-economic conditions in Clatsop County are, as discussed in note 7, *supra*, outside of NEPA's embrace. Therefore, there is no necessity to discuss whether the effects are major federal action.

9. In this litigation, the plaintiffs do not raise the application of NEPA to environmental impacts resulting from the construction of thermal generating plants. Rather, they focus on the industrial firm power contracts and their role in Phase 2. *See* Reply of Appellants and Cross Appellees at 30.

bution of power resources in BPA's marketing region. The course of action to be followed under Phase 2 was outlined in a document entitled "Hydro Thermal Program Phase 2" attached to a BPA press release of December 1973 and resulting from an agreement between BPA, its direct-service industrial customers, and the public, cooperative, and investor-owned utilities in BPA's region. The document envisions continuation of Phase 1 thermal plants, development of new thermal plants, and sale to industry in accordance with BPA's 1971 industrial sales policy and by means of industrial contracts that incorporate "third quartile" provisions. Although details of Phase 2 may remain unsettled, it is clear that Phase 2 is a long-range regional policy with definite goals and fixed roles for participants. As such, Phase 2 is a proposal within the contemplation of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

■ BPA's industrial customers are crucial to Phase 2 because of the capability of industrial firm power contracts to create reserves and to help finance thermal plants. BPA argues, however, that the execution of such contracts by its industrial customers other than Alumax is a mere contingency. Therefore, BPA concludes that preparation of an EIS on industry's role in Phase 2 would be premature. It is to be noted, however, that BPA and its large industrial customers are already operating under letter agreements that are, in effect, industrial firm power contracts. In addition, as far as the record shows, BPA has no intention of abandoning its industrial sales policy or the industrial firm power rate and is prepared to execute industrial firm power contracts with its major industrial customers. In these circumstances, NEPA does not permit delaying assessment of environmental factors until BPA is faced with the reality of executed contracts and the necessity of supplying power to industry until 1994. Rather, the assessment should occur at an early stage when alternative courses of action are still possible and environmental

damage can be mitigated. *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 327 (9th Cir. 1975).

■ BPA also asserts that Phase 2 is not a federal program. However, although Phase 2 is a cooperative enterprise involving BPA and nonfederal participants, it is BPA's participation that integrates the entire program. BPA will act as the agent for power produced by thermal plants and will to a large extent assure the success of these plants by direct sales of power to its own direct-service industrial customers. Without BPA, it is doubtful that Phase 2 would ever have been developed or, if developed, would have become feasible.

Particularly through "third quartile" provisions whereby industrial customers have the option to use thermal power or to suffer restriction of power provided in the third quartile, industrial firm power contracts help to advance the construction and operation of thermal plants. In return for executing the contracts, BPA's commitment to supply power to industry will be extended through the end of 1994. Behind the quid pro quo that the contracts represent lies the backdrop of projected substantial energy deficits. Phase 2 in all its parts is meant to meet these deficits and provide BPA's region with adequate energy in the future. This goal is laudable. Yet the ramifications of the impact that industrial firm power contracts will have on construction and operation of thermal plants have not been assessed. For example, it is unclear how much thermal power industry's new role would support. Considering the variable introduced by the third quartile, at what capacity will thermal plants operate? If all or part of BPA's industrial customers elect not to purchase thermal energy under the option provided in the third quartile and the viability of thermal plants may thereby be jeopardized, what other means (with what attendant environmental impacts) might BPA choose to meet the load growth of its preference customers? This latter question is important because the third quartile's potential for creating reserve power is fixed

by contract and it is unclear whether these anticipated reserves will suffice through 1994 when industrial firm power contracts terminate. Last, what means (with what attendant environmental effects) might BPA utilize to meet through 1994 the amount of power that industry can demand as a minimum supply after BPA has exercised all its options to restrict power under industrial firm power contracts?

BPA argues that industry's role in Phase 2 has been adequately treated in BPA's 1974 Wholesale Power Rate Increase EIS. We reject this argument. The Rate Increase EIS discusses the environmental effects of a 27% increase in BPA's wholesale power rates. It is not directed towards industry's relation to Phase 2. Rather, as the district court found, it discusses the new rates' effect on energy consumption in the BPA region. Moreover, the Rate Increase EIS did not and could not have considered the power that BPA is obligated to sell to Alumax's Umatilla plant.

As for the Umatilla contract, the magnitude of BPA's power commitment can be seen when it is realized that, if the Umatilla plant operated at close to 100 percent capacity, it would consume 2.7 billion kilowatts per year.[10] In reality, this supply is restrictable to a degree, but, unlike the contract for interruptible power considered in *Sierra Club v. Hodel*, 544 F.2d 1036 (9th Cir. 1976), the Umatilla contract creates a drain on the BPA system over and above BPA's other power commitments. This additional commitment to Alumax would be operative at a time when BPA predicts considerable power deficits in its marketing region[11] and when the region's power distribution scheme is in the process of change. Moreover, the commitment will extend to 1994 as soon as one other of BPA's industrial customers executes an industrial firm power contract.

BPA argues that its power commitment to Alumax will serve merely to create additional power reserves and, therefore, does not have any environmental effects. However, BPA's position unduly isolates the Umatilla contract from the other proposed industrial firm power contracts that are an integral part of Phase 2. The Umatilla contract is integrated into Phase 2. Whether or not BPA's additional power commitment to Alumax will have a proportionally large or small effect on Phase 2 remains to be explored in the EIS that must be prepared on the relation between Phase 2 and sales of industrial firm power.

### C. *Remedy*

 The plaintiffs argue in their appeal that the district court erred by not declaring the Umatilla contract void. Their argument rests upon § 10 of the APA, 5 U.S.C. § 706(2)(D), which provides in relevant part:

> The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law.

By declaring the contract unenforceable pending the preparation of an EIS, the district court did in fact "set aside" BPA's "action" because the Umatilla plant and BPA's transmission lines cannot be built until such an EIS is properly prepared and circulated. Thus, the contract's unenforceability preserves the environmental status quo. Further, it was the act of entering into the contract that was "without observance of procedure required by law." There is no suggestion that the terms of the contract are per se illegal in any way or exceed BPA's authority.

The plaintiffs, however, urge that a failure to void the contract means that BPA can reaffirm it after an EIS is prepared in a spirit of "grudging, *pro forma* compli-

---

**10.** The 320 megawatts of Umatilla contract demand are divided into four quartiles of 80 megawatts each. The first quartile is low priority interruptible power. The second provides for restriction in the event of delays in construction of the nonfederal utilities' thermal plants or the failure of the plants to operate initially at full capacity. Restriction in the third quartile depends upon the industrial customer's election not to take thermal power. Only the fourth quartile is close to being firm power.

**11.** In fact, BPA had once attempted to negotiate out of the Warrenton contract.

ance" with NEPA. *See Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974). But this argument ignores the fact that the district court has retained jurisdiction in order to implement its judgment and has expressly retained power to resolve controversies regarding the adequacy of any EIS. Thus, the parties and the court will have an opportunity to see that there is "full, fair, bona fide compliance with NEPA." *Id.* at 693.[12]

*CONCLUSION*

On the record before us, we hold that BPA must prepare an EIS on the construction of Alumax's Umatilla plant and the power transmission lines necessary to service the plant. We further hold that BPA must prepare an EIS on the relation between industrial firm power contracts and the coordinated activities known as Phase 2 of the Hydro Thermal Power Program. This latter EIS should include an assessment of the additional power commitment under the Umatilla contract. Last, we hold that the Port of Astoria does not have standing in this litigation.

We realize that Phase 2 is a complex scheme carefully designed to meet a complex and critical problem. We further realize that Phase 2 may be subject to some modifications that are perhaps due in no small part to the litigation that the program has engendered. *See Natural Resources Defense Council, Inc. v. Hodel*, 435 F.Supp. 590 (D.Or.1977), *appeal docketed*, No. 78–2014 (9th Cir. May 11, 1978). However, the record before us has determined our decision in this case.

The district court's judgment specifically provided that the court would retain continuing jurisdiction to oversee the implementa-

tion of its decree. The case is now remanded to the district court. The district court may exercise such powers as are necessary to achieve a reasonable conclusion of this litigation.

KENNEDY, Circuit Judge, concurring:

I concur in the majority's opinion, but wish to add my views concerning the right of the Port to comment on environmental impact statements. In this case the Port's environmental interest seems remote and therefore it may have no right to comment, but we should avoid any conclusion that the right to comment is limited to those agencies which are concerned with a broad spectrum of environmental issues. If responsibility for a particular subject that may have environmental consequences in some cases has been allocated to a state agency, that entity is entitled to comment when its area of control and expertise is affected by a federal project. This is so even if the agency's principal jurisdiction and responsibilities do not concern environmental problems. The Port of Astoria routinely comments in EIS drafts for projects of direct concern to it, and I do not think this opinion should be understood to deny its right to comment in an appropriate case.

---

12. The plaintiffs also argue that, at the hearing on their motion for a temporary restraining order, the district court misled them by stating that it would "declare the contract illegal and of no force and effect" if the plaintiffs prevailed. The full transcription of the district court's statement reads:

I will declare the contract illegal and of no force and effect after the hearing on the merits. So it appears that nobody is going to be damaged . . . by the signing of the con-

tract, because this Court does have authority to . . . declare the contract illegal and of no force and effect at a later date, *if a hearing on the merits warrants that.*

Transcript on appeal, proceedings of April 18, 1975, at 52:7–14 (emphasis supplied).

This language is ambiguous at most. It certainly cannot serve to straitjacket the district court to the point where it could not perform its duty of fashioning a remedy best suited to a case's merits.